ENTERED
CLERK, U.S. DISTRICT COURT

NOV 27 2000

DISTRICT OF CALIFORNIA
DEPUTY

Enter Closed Send

FILED
CLERK. U.S. DISTRICT COURT

NOV 2 1 2000

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

I HEREBY CERTIFY THAT THIS DOCUMENT WAS SERVED BY
FIRST CLASS MAIL, POSTAGE PREPAID, TO ALL COUNSEL
(OR PARTIES) AT THEIR RESPECTIVE MOST RECENT ADDRESS OF
RECORD IN THIS ACTION ON THIS DATE.

DATED:

DEPUTY CLERK

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

Docketed
Copies / NTC Sent
JS - 5 / JS - 6
JS - 2 / JS - 3
CLSD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. SAMIR CHACHOUA,<br><br>Plaintiff,<br><br>vs.<br><br>CEDARS-SINAI MEDICAL CENTER, et al.,<br><br>Defendant. | ) CASE NO. CV 97-05595 MMM (AJWx)<br>)<br>)<br>) ORDER DENYING DEFENDANT<br>) CEDAR-SINAI MEDICAL CENTER'S<br>) MOTION FOR JUDGMENT AS A<br>) MATTER OF LAW AND GRANTING<br>) MOTION FOR NEW TRIAL<br>)<br>)<br>) |

This action concerns sera and vaccines ("products")[1] developed by Dr. Samir Chachoua, which were submitted to Cedars-Sinai Medical Center ("Cedars") for testing to assess their efficacy in combating the HIV virus. A claim against Cedars for breach of contract, and a claim against Cedars and Dr. Eric Daar for conspiracy to defame proceeded to trial on August 1, 2000. Before the matter was submitted to the jury, Cedars moved for judgment as a matter of law on both counts. The court denied these motions. The jury found for Cedars and Daar on the conspiracy to defame claim, but returned a verdict of $10,111,250 against Cedars on the breach of contract claim.

---

[1] Dr. Chachoua testified that "products" best described the therapies he had developed, since some are sera (blood products) while others are vaccines. See Reporter's Transcript of Proceedings ("RT") at 113.

Cedars has now renewed its motion for judgment as a matter of law, and has also moved for a new trial on the breach of contract claim. Cedars argues that judgment should be entered as a matter of law because there was insufficient evidence of a contract between the parties, insufficient evidence of breach, and insufficient evidence to support the damages award. As respects the damage award, Cedars contends that plaintiff was not qualified as an expert to testify to the value of his products, and that his testimony was, in any event, deficient under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). It further asserts that the damages awarded were special damages, evidence of which was excluded by the ruling on Cedars' motion in limine. Finally, Cedars maintains that this range of damages was unforeseeable at the time it contracted with plaintiff, and thus that it cannot be recovered under settled California law.

Plaintiff counters that there was more than adequate evidence of a contract, and that the jury obviously rejected Cedars' argument that its contract to test the products was with Manning Post, a member of its Board of Governors,[2] rather than with plaintiff. Plaintiff maintains the jury found that Cedars breached the contract by failing to return the products and prime materials to him, and that the damages awarded were general rather than special, since they reflect the costs he incurred developing these items. Plaintiff contends he was competent to testify to these costs as the owner of the prime materials, and that the *Daubert/Kumho Tire* test is thus inapplicable. He further asserts that, even if *Daubert* and *Kuhmo Tire* apply, he was adequately qualified and his testimony is reliable.

There was sufficient evidence from which the jury could have concluded that Cedars had a contract with plaintiff and also that it breached that contract. Consequently, Cedars' Rule 50 arguments based on insufficient evidence of a contract and breach must be rejected. Cedars' damages arguments were not adequately preserved by the Rule 50(a) motions it made during trial, and consequently cannot form the basis for post-trial entry of judgment in its favor as a matter of

---

[2]The Board of Governors is a fundraising and community service group. See RT at 1158-59.

1    law.  For all of these reasons, Cedars' Rule 50 motion must be denied.

2         There was sufficient evidence from which the jury could have concluded that Cedars had

3    a contract with plaintiff and that it breached that contract.  Consequently, Cedars' Rule 50

4    arguments regarding evidence of a contract and breach must be rejected.  Cedars' damages

5    arguments were not adequately preserved by the Rule 50(a) motions it made during trial, and

6    cannot form the basis for entry of judgment in its favor post-trial.  Accordingly, Cedars' Rule 50

7    motion must be denied.

8         The court finds, however, that a new trial is warranted because the $10,111,250 damages

9    award is contrary to the clear weight of the evidence, and may include damages that are

10   speculative and/or not legally recoverable on the breach of contract claim.  The award is

11   apparently based on a finding by the jury that plaintiff gave Cedars his prime materials to

12   catalogue and store.  The only evidence in the record on this point is plaintiff's testimony.  None

13   of the documents created and exchanged by the parties at the time of contract formation, during

14   the period of contract performance, or following termination of the contract corroborates

15   plaintiff's assertion that Cedars undertook to catalogue and store the prime materials pursuant to

16   the contract.  The fact that such an obligation was not memorialized in any way significantly

17   undercuts plaintiff's assertion that it was a term of the contract, and leads the court to conclude

18   that a verdict based on such a finding is contrary to the clear weight of the evidence.

19        Additionally, the damages proof was limited to plaintiff's testimony that he expended $12

20   million to develop the prime materials he gave Cedars for cataloguing and storage, and that the

21   value of his products "brought to market" was billions.  Plaintiff proffered no documents, records

22   or other evidence to support his conclusory testimony that he incurred $12 million in expenses.

23   While he described generally the steps he took to develop the prime materials, and while he stated

24   that his work consumed twelve years, his testimony did not correlate to or support his conclusion

25   regarding cost.  Plaintiff testified that his work involved thousands of patients at a cost of

26   hundreds of dollars per week.  He offered no specifics, however, concerning the rate at which he

27   billed for services during the relevant period, concerning the grants he allegedly received to fund

28   the work, concerning his laboratory expenses, or any other item that would have allowed the jury

3

1    to conclude that $12 million was a reasonably accurate estimate of his expenditures.[3]  To the

2    extent, therefore, that the verdict was based on this testimony, it is contrary to the clear weight

3    of the evidence and a new trial is warranted.

4        Plaintiff also testified, in conclusory fashion, that,  brought to market, the products were

5    worth "billions."  Plaintiff was not qualified to offer such an opinion, however, and adduced no

6    competent evidence to support it.  Specifically, there is no evidence in the record suggesting that

7    it is reasonably certain that the products would have been introduced to the market, and no

8    foundation for plaintiff's assertion that they would have been worth billions of dollars if they had.

9    Consequently, any award based on this testimony is not only contrary to the clear weight of the

10    evidence but speculative.

11        For these reasons, the damages award is contrary to the clear weight of the evidence and

12    excessive.  Consequently, plaintiff's damages are remitted to $11,250, and  plaintiff is given the

13    option of accepting entry of judgment in that amount.  Should plaintiff decline the remittitur,

14    Cedars is granted a new trial.

15

16                   **I.  FACTUAL BACKGROUND**

17        In late 1995, Manning Post approached plaintiff about the possibility that he might have

18    his products tested at Cedars.[4]  In January 1996, Post contacted Dr. Shlomo Melmed, Director

19    of Cedars' Research Institute, and requested that he meet with plaintiff.  On January 22, 1996,

20    plaintiff met with Melmed and Dr. Eric Daar, Director of Cedars' AIDS and Immune Disorder

21    Center.

22        Plaintiff testified that Cedars agreed to (1) store and catalogue his prime materials;[5]

23    _____

24       [3]The weight of plaintiff's testimony in this regard is further undermined by the fact that
he failed to advise Cedars of the $12 million value of the materials at the time of contracting, and

25    by the fact that his post-contract communications with Cedars did not demand their return.

26       [4]*Id.* at 128 (Testimony of Dr. Samir Chachoua).

27       [5]He described the prime materials as cultures extracted from humans or organisms that are

28    used to create sera or vaccines to treat the HIV virus.  (*Id.* at 149-50.)

(2) perform *in vitro* tests on his products; (3) perform animal and human testing if the *in vitro* tests were successful; (4) maintain his technology and the test results confidentially; (5) not reverse engineer his products; (6) perform no testing outside the scope of the contract; (7) provide review by the hospital's Institutional Review Board; (8) assist plaintiff in his efforts to obtain a green card; and (9) publish the test results with his permission.[6] He further testified that Cedars agreed to give him credit as the inventor of the products in any articles that were published, and represented that it was not engaged in any similar work with third parties.[7]

Daar testified that no agreements were reached during the meeting, but that he and Melmed later committed to conduct *in vitro* testing of plaintiff's products in exchange for plaintiff's payment of an $11,250 fee.[8] Daar stated that he discussed the need to develop a testing protocol and delivery of the products with plaintiff in a subsequent telephone conversation.[9] He acknowledged that, pursuant to standard medical practice, Cedars was obligated to maintain the results of such tests confidentially.[10] Additionally, he agreed that Cedars' final test results were to be shared with plaintiff.[11] Daar assumed that any unused products would be returned to plaintiff after testing was complete.[12] In his view, this was the extent of the agreement; he asserted that Cedars never undertook to perform any of the additional activities enumerated by

---

[6]*Id.* at 151, 154-63.  Plaintiff maintains these facts are "undisputed." (See Plaintiff's Opposition to Motion for New Trial and Motion for Judgment as a Matter of Law ("Pl.'s Opp.") at 5:12.)  Neither Daar nor Melmed testified that the agreement was as broad as plaintiff contended, however, and Daar specifically denied that Cedars undertook several of the tasks plaintiff identified as part of the contract.

[7]*Id.* at 161, 224-25.

[8]RT 910-11, 915.

[9]*Id.* at 911.

[10]*Id.* at 929; 1005.

[11]*Id.* at 1005.

[12]*Id.* at 928.

1  plaintiff.[13]

2       Melmed's testimony was similar to Daar's.  He stated that no agreement was finalized at

3  the parties' initial meeting[14] but that, as a result of that meeting and a subsequent telephone

4  conversation, Daar agreed to test samples for plaintiff and Post.[15]  Melmed's testimony regarding

5  the terms of the contract was similar to Daar's.[16]

6       After the meeting, Melmed sent Post a letter stating: "I would like to suggest that Dr.

7  Chachoua initiate his relationship with Cedars-Sinai by sending Dr. Daar some of his anti-serum

8  samples for *in vitro* testing."[17]  Plaintiff testified that he received a copy of this letter,[18] and

9  responded: "Mr. Post advises me that you wish to proceed with initial testing of [the] anti-

10 sera. . . .  Samples of various antisera and biological extracts have been prepared and will be

11 delivered to you by Mr. Post."[19]  Plaintiff noted that he "firmly believe[d] that the results [of the

12 *in vitro* testing would] lead to animal and human testing. . . ."[20]

13      Neither plaintiff's nor Melmed's letters referenced any of the additional contractual terms

14 plaintiff identified during his testimony.  Most significantly, neither letter mentioned the "prime

15 materials" that plaintiff said he gave Cedars to catalogue and store.  Similarly, none of Cedars'

16 internal documents, including the testing protocol, reference prime materials, or reflect that

17 Cedars was to catalogue and/or store property belonging to plaintiff.  Their sole focus is *in vitro*

18

---

19      [13]*Id.* at 921-30.

20

21      [14]*Id.* at 1162.

22      [15]*Id.* at 1166.

23      [16]*Id.* at 1166-72.

24      [17]Trial Exhibit ("TE") 11; Memorandum of Points and Authorities In Support of Cedars-
    Sinai Medical Center's Motion for New Trial ("Def.'s Mot. for New Trial"), Ex. 1.
25

26      [18]RT 131.

27      [19]TE 12; Def.'s Mot. for New Trial, Ex. 2.

28      [20]*Id.*

6

testing of plaintiff's products.[21]

Plaintiff testified that he had developed fifty products in all,[22] and that he delivered thirty-six of them to Cedars for testing.  He said that he also gave Cedars thirty-six prime materials to catalogue and store.[23]  Daar testified he had never heard the term "prime materials," and did not know what it meant.  He further stated that plaintiff never mentioned prime materials, and that the items he received for testing were not so labeled.[24]  Melmed likewise testified that he did not know what prime materials were.[25]  As respects product testing, the written protocol developed by Cedars with input from plaintiff reflects that thirty — not thirty-six — products will be tested.[26]

Plaintiff said that he kept a copy of each of the products he gave to Cedars.[27]  Later, he said he had retained copies of some of them.[28]  Plaintiff testified that these copies were destroyed when someone broke into his laboratory.[29]  This apparently occurred in or about 1999.[30]

On April 3, 1996, Post sent Cedars an $11,250 check to cover the cost of the testing.[31]  Plaintiff testified that he wired the funds to Post, who then purchased the cashier's check provided

---

[21]See, e.g., TE 13, 14.

[22]RT 147-48.

[23]*Id.* at 140, 147-48, 149.

[24]*Id.* at 922-23.

[25]*Id.* at 1168.

[26]TE 13.

[27]RT 148.

[28]*Id.* at 356.

[29]*Id.*

[30]*Id.* at 861 (Testimony of Dr. Manuel Noriega).

[31]TE 18; Def.'s Mot. for New Trial, Ex.4.

7

to Cedars.[32]  In a letter to Carolyn Heard, a grants and contracts administrator for Cedars, Daar described the check as having come from plaintiff.[33]

Plaintiff delivered the products to Cedars,[34] and testing commenced.[35]  Plaintiff said that Daar conducted tests he was not authorized to perform, specifically tests of "mixes" of the products and cytotoxicity testing.[36]  He also asserted that Cedars disclosed the test results to Suzanne Henig, with whom he was in litigation, and that Daar used the test data to publish a paper under his name in breach of the agreement.[37]

On July 26, 1996, Daar wrote plaintiff a letter terminating the parties' collaboration.[38] Daar testified that he decided to terminate the testing because plaintiff asked him to treat patients at Cedars to assess the efficacy of the products on humans, and because he took the position that "nothing else needed to be done" before human testing could commence.[39]  Daar also identified as bases for the termination plaintiff's refusal to authorize further cytotoxicity testing, and a telephone call he received from an unidentified person who stated that plaintiff was using Cedars' name to promote the products.[40]  Plaintiff denied asking Daar to treat patients.  He also asserted

---

[32]*Id.* at 237.

[33]TE 19.

[34]*Id.* at 912.

[35]TE  23, 24, 26, 27.

[36]RT at 271-74.

[37]*Id.* at 366-68.

[38]TE 28; Def.'s Mot. for New Trial, Ex. 6.

[39]*Id.* at 956-57.

[40]*Id.* at 942-44, 958-59, 962.  Daar also said he received a call from Suzanne Henig, who likewise said plaintiff was representing that Cedars had validated the efficacy of the sera and vaccines.  *Id.* at 961.

8

that he never refused to allow cytotoxicity testing,[41] and that he was willing to allow such testing if purer samples were used.[42]

Daar testified that he contacted Post regarding termination of the testing,[43] and Cedars introduced an August 13, 1996 letter from Post to Dan Oshiro, directing Oshiro to return the unused product samples and funds to Post.[44] Plaintiff contends this letter is a forgery because it was attached to a July 16, 1996 memorandum from Daar to Melmed;[45] Cedars contends the memorandum merely bears an incorrect date.[46]  Daar stated that, after receiving Post's communication, he sent Post the unused product;[47] a writing purportedly signed by Post acknowledging receipt of the items was admitted as an exhibit at trial.[48]  James Laur, Cedars' deputy general counsel, later sent Post a check for $4,500, representing the balance of the testing fee.[49]

Plaintiff testified that he never received the remaining product or the $4,500.[50]  On November 20, 1996, plaintiff's attorney sent Cedars a letter demanding that it complete the testing.[51]  The letter did not reference the prime materials or demand their return.

---

[41]See Pl.'s Opp. at 10:27-11:2.

[42]RT at 386-87.  Plaintiff testified that he was traveling and therefore could not provide the purified samples.  *Id.*

[43]*Id.* at 962.

[44]TE 29; Def.'s Mot. for New Trial, Ex. 7.

[45]See Pl.'s Opp. at 7:21-8:2.

[46]RT at 971.

[47]TE 29; Def.'s Mot. for New Trial, Ex. 7.

[48]RT 971-72.

[49]TE 51; Def.'s Mot. for New Trial, Ex. 9.

[50]RT at 422-23.

[51]TE 57; Def.'s Mot. for New Trial, Ex. 11.

9

1    As respects damages, plaintiff testified that his products cost $12 million to develop[52] over

2 a period of some twelve years.[53]  Initially, plaintiff stated that he spent his own money on the

3 project;[54] later, he stated that he had received some grant funding but maintained that the "bulk"

4 of the money he spent was his own.[55]

5    Plaintiff explained that these costs were incurred performing tests on thousands of patients

6 to determine what organisms would interfere with HIV,[56] and that taking cultures from patients

7 cost "in the hundreds of dollars over a series of weeks per patient."[57]  Amplifying on the process

8 he utilized, plaintiff stated that, commencing in the mid- to late 1980's, he sought to identify

9 which strains of infection appeared to attack HIV by making "statistical observations" of his

10 patients, taking "frequent X-rays," and conducting "frequent investigations" of patients who had

11 contracted infections he could not arrest.[58]  Once he determined which cultures inhibited the

12 disease, he performed cross-matching tests and purified the extracts in order to minimize or

13 eliminate the possibility of allergic reactions.[59]  He then placed the cultures he had isolated in a

14 data bank.[60]

15    Plaintiff also testified that he tried to isolate extracts from the immune systems of persons

---

18   [52]RT at 355 ("Q. And what was the cost to you to develop that?  A. Close to $12 million");
19   380 ("[T]hey took me close to $12 million to do").

20   [53]Id. at 377.

21   [54]Id. at 356, 372-73.

22   [55]Id. at 373.

23   [56]Id. at 378.

24   [57]Id.

25   [58]Id. at 112-13.

26   [59]Id.

27   [60]Id. at 147.

28

with arthritis, lupus and other auto-immune diseases,[61] and that he did "extensive toxicity testing" over a three to four year period from the late 1980's to the early 1990's.[62]  He summarized his efforts as follows: "Thousands of patients adds up to millions of dollars."[63]  Plaintiff also testified to his opinion of the loss he suffered as a result of the alleged misappropriation of his idea.  He stated that such a loss would be "all the money [he] spent in developing the sera, first[, and] . . . all the money that could be raised by bringing the sera to market which is billions."[64]

Finally, plaintiff attempted to testify as an expert to the "value" of his products once they were FDA-approved.  The court precluded this testimony, holding that plaintiff had not been designated as an expert in this field and that he had not adequately demonstrated he was qualified to express opinions on the subject.[65]  Other damage testimony was relevant only to plaintiff's claim for defamation.[66]

---

[61]Id. at 117-18.

[62]Id. at 121, 123.

[63]Id.  See also id. at 147 ("To screen those thousands of patients would cost hundreds of thousands, millions of dollars and take a long time").

[64]Id. at 381.  Plaintiff suggested that he had formed this opinion based on conversations with Merrill Lynch representatives and lawyers, and after calculating the cost of "media response." (Id. at 379.)

[65]See id. at 310-14.  Additionally, plaintiff was asked to "value" what was taken from him by Cedars. (Id. at 368-69.)  This question was never answered directly.  He was also asked how he would value receiving credit for this kind of work.  He responded: "You know how much a vaccine, how many people would benefit from a vaccine for AIDS, for example.  You know what the current expenses are for one single AIDS patient on the current therapy which is not as effective as this. [¶] . . . There are millions if not billions of people who could benefit from this therapy that would all be taking it to prevent cancer or AIDS or to treat it. [¶] You are talking about a multi-billion dollar industry." (Id. at 370.)

[66]Michael Pope, a director of an organization named Save a Life Foundation (id. at 779), testified, for example, that the group had committed approximately $10 million to further plaintiff's research efforts (id. at 782-83).  Pope said that, once Save a Life Foundation received articles and learned of other publicity that allegedly defamed plaintiff (id. at 783-85), its financial backing "dissolved" and Pope "lost heart" as well (id. at 785).  Bo Hallgren, a co-founder of the Santa Monica Patient's Association, testified that his organization had already given plaintiff

11

## II. DISCUSSION

**A.    Motion For Judgment As A Matter Of Law**

### 1.    Legal Standard For Judgment As A Matter Of Law

Rule 50(b) of the Federal Rules of Civil Procedure allows the court to enter judgment as a matter of law after trial or verdict where there is no legally sufficient evidentiary basis upon which a reasonable jury could have found for the non-moving party. Judgment as a matter of law should be granted if the evidence, "construed in the light most favorable to the non-moving party[,] permits only one reasonable conclusion as to the verdict and that conclusion is contrary to the jury's; it is improper if reasonable minds could differ over the verdict." *Fleming v. Dep't of Pub. Safety*, 837 F.2d 401, 408 (9th Cir. 1988).

In ruling on a motion for judgment, the court may not weigh the evidence or assess the credibility of witnesses. *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 59-60 (2d Cir. 1993). If the verdict is supported by substantial evidence, the court cannot substitute its judgment for that of the jury, but must uphold the verdict. *United States for Use and Benefit of Reed v. Callahan*, 884 F.2d 1180, 1183 (9th Cir. 1989). Substantial evidence is such relevant evidence as reasonable minds might consider adequate to support a conclusion, even if it is possible to draw two inconsistent conclusions from the evidence. *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).

"Under [R]ule 50(b), a party may move for a judgment notwithstanding the verdict only

---

$300,000 for research and treatment of patients, and that it had planned to commit an additional $60 million. (*Id.* at 872). When the organization received a letter stating that plaintiff was a fraud (*id.* at 873), however, it canceled the investment. Even had Pope and Hallgren linked their organizations' refusal to make further grants to Cedars' breach of contract, as opposed to the allegedly defamatory statements of which they learned, their testimony could not be considered in evaluating whether there was sufficient evidence to support the jury's $12 million breach of contract verdict. In response to a motion in limine brought by Cedars, and not opposed by plaintiff, the court ruled that plaintiff could not introduce evidence of special damages in connection with his breach of contract claim. In his response to defendants' motions for judgment and new trial, plaintiff concedes that grant monies not received from the Save a Life Foundation and Santa Monica Patient's Association are a species of special damages not recoverable on the contract claim.

1   if the party has moved for a directed verdict at the close of all the evidence.  'In general, the

2   requirement that the motion be made at the close of all the evidence is to be strictly observed.'"

3   *Johnson v. Armored Transport of California, Inc.*, 813 F.2d 1041, 1042 (9th Cir. 1987) (quoting

4   *Farley Transportation Co. v. Santa Fe Trail Transportation Co.*, 786 F.2d 1342, 1346 (9th Cir.

5   1986)).  See also *Cruz v. Local Union Number 3 of the Int'l Brotherhood of Electrical Workers*,

6   34 F.3d 1148, 1155 (2d Cir. 1994) ("[A] judgment as a matter of law is limited to those issues

7   'specifically raised in [a] prior motion for a directed verdict,'" quoting *Samuels v. Air Transport*

8   *Local 504*, 992 F.2d 12, 14 (2d Cir. 1993)); *Murphy v. City of Long Beach*, 914 F.2d 183, 186

9   (9th Cir. 1990) ("a district court may not enter a JNOV on grounds not asserted in a party's

10  motion for directed verdict"); *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 183, n.

11  9 (9th Cir. 1989) ("While the motion for j.n.o.v. follows the jury's verdict, it must be preceded

12  by a motion for directed verdict at the close of all the evidence").

13              **2.      Sufficiency Of Evidence Regarding Existence Of A Contract**

14              Cedars contends there was insufficient evidence of a contract between it and plaintiff, and

15  thus that judgment must be entered in its favor as a matter of law.[67]  There was clearly sufficient

16  evidence in the record, however, to support the jury's finding that there was a contract between

17  the parties.  To prove the existence of a contract, a plaintiff must demonstrate "(1) parties capable

18  of contracting, (2)  consent, (3) a lawful object, and (4) a sufficient cause or consideration."  Cal.

19  Civ. Code § 1550; *Schaefer v. Williams*, 15 Cal.App.4th 1243, 1246 (1993).  Consent must be

20  mutual, i.e., the parties must "agree upon the same thing in the same sense."  Cal. Civ. Code

21  § 1580; *Weddington Productions, Inc. v. Flick*, 60 Cal.App.4th 793, 811 (1998).  "The existence

22  of mutual consent is determined by objective rather than subjective criteria, the test being what

23  the outward manifestations of consent would lead a reasonable person to believe."  *Weddington*,

24  *supra* (quoting *Meyer v. Benko*, 55 Cal.App.3d 937, 943 (1976)).

25              Cedars contends there was no contract because there was no mutual assent.  There was

26

27              [67]See Defendant's Renewed Motion for Judgment as a Matter of Law ("Def.'s Renewed

28  Mot.") at 4:5, 12-15.

                                                        13

adequate evidence, however, from which the jury could have concluded that the parties mutually agreed that Cedars would test plaintiff's products. Both Daar and Melmed testified that the parties agreed Daar would perform laboratory tests on the products, and letters between plaintiff and Daar confirm that such a contract was formed. Daar acknowledged, moreover, that $11,250 had been paid by or on plaintiff's behalf to cover the cost of performing the tests.[68] Perhaps for this reason, Cedars concedes in its motion the existence of a contract to perform laboratory tests.[69] As respects another potentially key element of the contract, Daar admitted that Cedars had an obligation to maintain the results of its tests confidentially, and not to disclose them to anyone other than plaintiff. Thus, the jury could have concluded that this too was a term of the contract.

Finally, the jury could have believed plaintiff and disbelieved Melmed and Daar as regards Cedars' alleged undertaking to catalogue and store plaintiff's prime materials. While none of the parties' contemporaneous writings make any reference to prime materials, or indeed anything other than the testing of plaintiff's products, it is possible the jury believed plaintiff's explanation that cultures are routinely given to major institutions for storage and cataloguing, and that the testing protocol represented only a portion of his agreement with Cedars.[70]

In short, construed in the light most favorable to plaintiff, there was legally sufficient evidence to support the jury's finding that the parties entered into a contract. Cedars' motion for judgment as a matter of law on this ground must therefore be denied.

### 3.    Sufficiency Of Evidence Regarding Breach Of Contract

To state a cause of action for breach of contract, a party must prove the existence of a valid contract, his or her performance of the contract or excuse for nonperformance, defendant's breach, and resulting damage. See *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 307

---

[68]Whether Post or plaintiff paid for the testing, Daar acknowledged that the funds were sent on plaintiff's behalf.

[69]"[T]here was no evidence . . . of any mutual assent between Cedars and Chachoua regarding anything other than preliminary laboratory testing of serums." (See Def.'s Renewed Mot. at 13:19-20.)

[70]See RT at 463.

1  (1999); *Walsh v. West Valley Mission Community College District*, 66 Cal.App.4th 1532, 1545

2  (1998).

3       As noted in the preceding section, there was sufficient evidence from which the jury could

4  have found that the parties entered into a contract regarding testing of plaintiff's products.  There

5  was also sufficient evidence from which the jury could have concluded that plaintiff performed

6  his duties under the contract by paying the testing fee or causing it to be paid.  The jury could

7  have credited plaintiff's testimony that cytotoxicity testing was not part of the original contract,

8  and that he did not ask Daar to treat patients with his vaccines.  It could also have discounted

9  Daar's testimony regarding the telephone call he received, finding not credible the suggestion that

10  Cedars terminated the contract on the basis of an anonymous tip.  As a result of these various

11  findings, the jury could legally have determined that Cedars terminated the contract prematurely

12  and without justification.

13       Cedars concedes, moreover, that it had an obligation to return plaintiff's unused products

14  and money upon termination of the contract.[71]  There was sufficient evidence to support a jury

15  finding that plaintiff never received the unused products and testing fee.  Consequently, the jury's

16  finding that Cedars breached the contract in this regard is adequately supported in the record.

17  Similarly, the jury could have found that Daar improperly mixed products and conducted

18  cytotoxicity tests of plaintiff's products,[72] and/or that he disclosed the test data to third parties

19  and/or misappropriated them for use in the article he published with Angeline Douvas and

20  others.[73]  Thus, there was adequate evidence from which the jury could have concluded that

21  Cedars breached its contract with plaintiff, and Cedars' motion for judgment as a matter of law

22  on this ground is denied.

23  _____

24       [71]"Cedars was not obligated to do anything further other than return Chachoua to his
    condition at the outset of the contract.  Cedars did this by delivering the unused portions of the
25  serums and funds to Post. . . . As a matter of law, Cedars cannot be held liable for failing to
    perform any further contract terms."  (*Id.* at 16:25-17:1.)
26

27       [72]See RT at 266-72, 272-74.

28       [73]See *id.* at 292-94, 364-68, Ex. 56.

### 4.   Sufficiency Of Evidence Regarding Damages

Cedars mounts three attacks on plaintiff's damages proof: (1) that plaintiff was not competent to testify to the cost of creating the products and prime materials because he was not qualified as an expert and because his testimony lacked scientific reliability as required by *Daubert* and *Kumho, supra*; (2) that only general damages were recoverable on plaintiff's breach of contract claim, and thus that lost grant monies were not properly awarded; and (3) that damages of the magnitude awarded by the jury were not foreseeable to Cedars at the time it entered into the contract.

As noted earlier, the grounds upon which a party may seek post-verdict judgment as a matter of law are limited to those "'specifically raised in [a] prior motion for a directed verdict.'" *Cruz, supra*, 34 F.3d at 1155.  See also *Murphy, supra*, 914 F.2d at 186; *Air-Sea Forwarders, supra*, 880 F.2d at 183, n. 9.  Cedars moved for judgment on two occasions before the case was submitted to the jury.  In its first motion, Cedars argued that there had been "no credible evidence of any damages . . . presented on any of the claims in this case."[74]  It asserted that the unused products and a pro rata portion of the testing fee had been returned to Post (and hence to plaintiff), and that plaintiff had received value for the balance of the fee in the form of the testing Cedars had completed.[75]  In its second Rule 50 motion, Cedars asserted that plaintiff had interfered with its completion of the contract by refusing to allow cytotoxicity testing.  It also argued that the unused portion of the fee returned to Manning Post was proportional to the testing that remained to be done.[76]

Cedars did not argue in its Rule 50 motions that plaintiff's testimony regarding the cost of creating the products or their value was incompetent and contrary to the Supreme Court's rulings in *Daubert* and *Kumho*.  It also did not argue that the damages plaintiff claimed were unforeseeable and thus not cognizable under California law.  Finally, it did not argue that plaintiff

---

[74]RT at 1138, 1143.

[75]*Id.* at 1143-44.

[76]*Id.* at 1470-71.

1    sought to recover special, as opposed to general, damages in violation of the pretrial ruling on

2    Cedars' motion in limine.[77]

3            Cedars' general statement that there was "no credible evidence of any damages" was not

4    adequate to preserve the arguments it now seeks to raise in its motion for judgment as a matter

5    of law. *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144,1180 (3d Cir. 1993)

6    (where a defendant challenged damages only generally in its Rule 50(a) motion, and failed to state

7    the specific reasons later articulated in its post-trial motion for judgment, "the lack of specificity"

8    in the earlier motion precluded the entry of judgment in its favor).  See *Correa v. Hospital San*

9    *Francisco*, 69 F.3d 1184, 1193 (1st Cir. 1995) ("The movant cannot use such a motion as a

10   vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a

11   directed verdict"); J. Moore, 5A MOORE'S FEDERAL PRACTICE AND PROCEDURE, ¶ 50.08 (2d ed.

12   1994) (a motion for judgment after the verdict under Rule 50(b) "may only be premised upon

13   particular grounds raised in the earlier motion made at the close of all the evidence," and thus "any

14   argument omitted from the motion made at the close of the evidence is waived as a ground for

15   judgment under Rule 50(b)").  Accordingly, Cedars' post-trial motion for judgment based on

16   alleged inadequacies in plaintiff's damage proof cannot be entertained.

17   **B.     Motion For New Trial**

18           **1.     Legal Standard Governing Motions For New Trial**

19           "[A] new trial may be ordered by the district court if, in its opinion, the jury's verdict was

20   clearly contrary to the weight of the evidence."  *William Inglis & Sons Baking Co. v. ITT*

21   *Continental Baking Co., Inc.*, 668 F.2d 1014, 1027 (9th Cir. 1981).  Thus, unlike judgment as

22   a matter of law, a new trial may be granted even where the record contains sufficient evidence

23   to support the jury's verdict. *Markovich v. Bell Helicopter Textron, Inc.*, 805 F.Supp. 1231,

24   1235 (E.D.Pa. 1992).  A district court may order a new trial based on insufficient evidence only

25

_____

26           [77]Indeed, the court reaffirmed its ruling in this regard during the course of the trial, and

27   plaintiff disavowed any intention of seeking special damages – i.e., lost grant monies – on the
     breach of contract claim.  As noted earlier, plaintiff reiterated this position in response to Cedars'

28   post-trial motions.

1   if it finds that the jury's verdict "is against the great weight of the evidence, or it is quite clear that

2   the jury has reached a seriously erroneous result." *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680

3   (9th Cir. 1997) ("a stringent standard applies when the motion is based on insufficiency of the

4   evidence"); *Roy v. Volkswagen of America, Inc.*, 896 F.2d 1174, 1176 (9th Cir.), as amended,

5   920 F.2d 618 (9th Cir. 1990).  See also *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139

6   (9th Cir. 1999) ("The trial court may grant a new trial, even though the verdict is supported by

7   substantial evidence, if 'the verdict is contrary to the clear weight of the evidence, or is based

8   upon evidence which is false, or to prevent, in the sound discretion of the trial court, a

9   miscarriage of justice'"); *Rattray v. City of National City*, 51 F.3d 793, 800 (9th Cir. 1994)

10  (holding that the district court had discretion to grant a new trial where the jury's verdict was

11  contrary to the "clear weight of the evidence" or based on false evidence, or where a new trial is

12  needed to prevent a "miscarriage of justice" (citations and internal quotation marks omitted)).  The

13  trial court may also grant a new trial where the verdict is supported by legally inadequate

14  evidence.  See *Dunn v. Consolidated Rail Corporation*, 890 F.Supp. 1262, 1287 (M.D.La. 1995)

15  ("A court may grant relief if the verdict is excessive or inadequate as a matter of law, or if the size

16  of the verdict is against the weight of the evidence"); 11 Wright & Miller, FEDERAL PRACTICE

17  AND PROCEDURE, § 2807, p. 50 (1973) (same).  The decision to order a new trial lies within the

18  sound discretion of the district court.  *4.0 Acres of Land, supra; Desrosiers v. Flight International*

19  *of Florida Inc.*, 156 F.3d 952, 957 (9th Cir. 1998).

20      In ruling on a motion for a new trial, the court may weigh the evidence and evaluate the

21  credibility of witnesses.  It need not view the evidence from the perspective most favorable to the

22  prevailing party.  *Roy, supra*, 896 F.2d at 1176; *Landes Construction Co., Inc. v. Royal Bank*

23  *of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).  Nonetheless, the court may not grant a new

24  trial "merely because it might have come to a different result from that reached by the jury." *Roy,*

25  *supra*, 896 F.2d at 1176.  Rather, its review is constrained by "[t]he fundamental principle . . .

26  that there must be a minimum of judicial interference with the jury."  9A Wright & Miller,

27  FEDERAL PRACTICE AND PROCEDURE, Civil, § 2524, at p. 261 (1995).  "Doubts about the

28  correctness of the verdict are not sufficient grounds for a new trial: the trial court must have a

1   firm conviction that the jury has made a mistake." *Landes*, *supra*, 833 F.2d at 1372.

2   **2.   Whether A New Trial Should Be Granted In This Case**

3   The jury awarded plaintiff $10,111,250 in damages on the breach of contract count.  The

4   record contains evidence of four possible types of damage on which the jury might have relied:

5   (1) the contract price for testing the sera and vaccines; (2) the loss of future grant monies; (3) the

6   costs plaintiff incurred developing the products and prime materials; and (4) the "value" of

7   plaintiff's idea that Cedars allegedly disclosed to third parties and/or misappropriated.  The court

8   will consider each of these in turn.

9   **a.   Cost Of Testing The Products**

10   As noted earlier, there was sufficient evidence from which the jury could have concluded

11   that plaintiff never received his unused products or the $4,500 Cedars purportedly refunded when

12   it ceased testing.  Given the fact that Cedars elected to return the unused products and fee to Post

13   instead of plaintiff, and given the conflicting testimony regarding Post's role in brokering the

14   contract, the jury could have determined that Cedars' decision to send the products and money

15   to Post was not reasonably calculated to ensure their return to plaintiff, and constituted a violation

16   of the contract.  There was also sufficient evidence from which the jury could have concluded that

17   Cedars' termination of the contract was premature and that it should have completed testing.

18   Finally, there was sufficient evidence from which the jury could have concluded that Cedars

19   conducted tests outside the parameters of the contract without plaintiff's consent.  Since the

20   evidence regarding the cost of testing was undisputed, the jury's award of part or the whole of

21   the $11,250 contract price was not contrary to the clear weight of the evidence.

22   **b.   Testimony Regarding Future Grant Monies**

23   Defendants assert that the jury may improperly have considered evidence of future research

24   grants in arriving at its damages award.  Pope and Hallgren testified that their organizations either

25   had or were about to commit millions of dollars to plaintiff's work.  Plaintiff's attorney

26   specifically stated in closing argument, however, that these monies were to be considered by the

27   jury only in connection with the defamation claim, and the court instructed the jury that it could

28   not award speculative damages on the contract claim, defined as "compensation for future loss or

harm which although possible is conjectural and not reasonably certain."[78]  Moreover, plaintiff concedes, in his opposition to Cedars' motion, that evidence of lost grant monies cannot be used to support the verdict.  Consequently, it is appropriate to eliminate evidence of this species of damage in assessing whether the $10,111,250 award on the breach of contract claim was contrary to the clear weight of the evidence.

**c.**     **Testimony Regarding The $12 Million Cost Of Developing The Products**

**i.**     **Plaintiff's Competency To Testify To The Expenditures**

The next species of damage about which there is testimony in the record is the cost of developing the prime materials and products.  As a threshold matter, the court must address Cedars' argument that plaintiff's testimony regarding the $12 million was inadmissible under *Daubert* and *Kumho* because he was not qualified to testify as an expert about the value of the products.  Plaintiff did not express an opinion regarding the value of the prime materials and products; rather, he testified to the expenditures he had made, in time and money, in the course of developing the products.  Specifically, he discussed seeing thousands of patients, obtaining cultures from them at a cost of hundreds of dollars per patient, and thereafter conducting purification and cross-matching tests to extract prime materials from the cultures he had obtained.  Because he was testifying to out-of-pocket expenditures, plaintiff did not need to qualify as an expert.  The fact that he produced no receipts, purchase orders, or other documentation affects the weight, not the admissibility, of the testimony.

**ii.**     **Testimony Regarding The Cataloguing And Storage Of The Prime Materials**

Plaintiff stated clearly during his testimony that $12 million was the cost of developing the prime materials as opposed to the products he gave Cedars to test.[79]  Thus, in evaluating whether a verdict based on the $12 million cost of developing the prime materials is contrary to the clear

---

[78]RT at 1452-53.

[79]RT at 400-01.

20

weight of the evidence, it is necessary to examine what testimony and/or documents support a finding that Cedars undertook to catalogue and store the materials.

Assuming the jury found that Cedars was contractually obligated to store and catalogue the prime materials, it would have had to base that finding solely on plaintiff's testimony. There was no contemporaneous documentation supporting plaintiff's assertion that he gave prime materials to Cedars for storage and cataloguing, or that Cedars undertook to perform these functions.[80] Plaintiff's initial letter to Cedars after it had agreed to undertake testing makes absolutely no mention of prime materials, storage or cataloguing.[81] Rather, it states that "[s]amples of various antisera and biological extracts have been prepared and will be delivered to you by Mr. Post" for evaluation and testing[82] The word "samples" is used throughout, and the majority of the letter concerns the results plaintiff anticipates the testing will produce.[83]

Furthermore, no document memorializes Cedars' alleged undertaking to store and catalogue the prime materials. The testing protocol, which identified thirty (rather than thirty-six) products that were to be tested, makes no mention of prime materials, storage or cataloguing.[84] Cedars' internal documents are similarly silent; they speak only of testing plaintiff's products. It strains credulity to believe that Cedars would assume responsibility for safeguarding and cataloguing plaintiff's materials without a writing to that effect, particularly if they cost $12

---

[80]As respects other alleged contract terms, by contrast, Daar either agreed that they were implied in the agreement (e.g., confidentiality), or there was some evidence in the record suggesting they had been performed by Cedars (e.g., Daar's "To Whom It May Concern" letter provided some support for plaintiff's contention that Cedars agreed to assist him in obtaining a green card).

[81]TE 12.

[82]*Id.*

[83]Similarly, Melmed's letter to Post states: "I would like to suggest that Dr. Chachoua initiate his relationship with Cedars-Sinai by sending Dr. Daar some of his anti-serum samples for in vitro testing." (TE 11.)

[84]TE 13.

million to develop and were among the only copies of the cultures extant.[85]   Additionally, it is unlikely that Cedars would have undertaken to perform such functions without a fee.  On this score, the evidence is undisputed that the $11,250 contract price was the cost of testing plaintiff's product samples.[86]

Even more telling, none of plaintiff's post-termination correspondence demands return of the prime materials.  Rather, on November 20, 1996, his attorney sent Cedars a letter in which he demanded that it continue and complete its testing of the product samples that had been provided.[87]  No letter demanding the materials' return was ever sent.  It is logical to assume that, if Cedars had prime materials in its possession worth $12 million, plaintiff and/or his legal representatives would have demanded their return at some point prior to initiating litigation.

Thus, in the court's view, the great weight of the evidence suggests that plaintiff never delivered prime materials to defendant.  See *Moxness Products, Inc. v. Xomed, Inc.*, 891 F.2d 890, 893 (Fed. Cir. 1990) ("The district court assessed the demeanor and credibility of Dr. Goldberg and concluded that his testimony could not be reconciled with the documentary evidence.  Because the court was free to weigh the evidence and assess witnesses' credibility, the conditional grant of a new trial was not an abuse of discretion").  To the extent the jury's verdict was based on Cedars' failure to return these materials to plaintiff, therefore, this alone provides a basis for granting a new trial.

### iii.   Testimony Regarding The Expenditure Of $12 Million

Even if the weight of the evidence supported a finding that plaintiff delivered prime materials to Cedars, the court would nonetheless feel constrained to grant a new trial.  The only evidence that plaintiff expended $12 million to develop the prime materials was his own

---

[85]In fact, Daar and Melmed denied receiving prime materials, or knowing what they were.

[86]See TE 13, 14.  Plaintiff testified that he understood the "indirect costs" identified on the protocol included Institutional Board Review.  He did not say he understood that they included a fee for storing and cataloguing the prime materials.

[87]TE 57.

1   testimony.  As respects the costs actually incurred, that testimony was conclusory and lacked any

2   documentary support.  In describing the steps he took to isolate inhibitory cultures, plaintiff made

3   reference to tests performed on thousands of patients, to expenditures of hundreds of dollars per

4   week, and to a data bank he created.  He made no effort, however, to identify the components

5   of the $12 million figure, or to provide any breakdown whatsoever — i.e., to assign a cost to the

6   time he expended in this process, to the fees he (as opposed to his patients) paid for testing, or

7   to any other specific cost associated with the work.  Plaintiff produced no records of the

8   expenditures he had made, or of the grant funds he received during the course of the twelve year

9   study.  Nor did he state that such records were no longer in existence.  Finally, he proffered no

10  records of the tests he conducted or the data bank he established.[88]

11       It is logical to assume that expenditures as significant as those to which plaintiff testified

12  would have been documented in some fashion, and that a party seeking to recover such sums as

13  damages would adduce the documents as evidence in support of his claim.[89]  See *Taliferro v.*

14  _____

15  [88]Plaintiff sought to introduce photographs and/or X-rays allegedly shown to Melmed and
    Daar at their initial meeting.  The documents were excluded, however, because they were not
16  identified as exhibits and produced in accordance with the Local Rules and Federal Rules of Civil
17  Procedure.  There is no indication that the documents plaintiff sought to offer to prove what
    transpired at the meeting contained any cost information.

18
    [89]At the hearing on this motion, plaintiff's counsel argued that plaintiff's development of
19  the cultures was not like "buying a door [or] . . . a door knob for a house," and thus that his
20  expenditures were not the kind for which receipts would exist.  Counsel expounded: ". . . [T]he
    explanation [of plaintiff's work] is much more powerful than any bill that anyone could see[,] is
21  much more powerful than anything else because . . . you're inventing intellectual property, we
    don't have those kind of bills that I paid this guy 20 hours to go build my foundation."
22  (Reporter's Transcript of Proceedings, October 2, 2000 ("October 2 RT") at 22.)  Contrary to
23  counsel's suggestion, plaintiff's description of his work suggests he spent twelve years running
    a clinic in which he saw thousands of patients at a cost of $12 million.  One administering an
24  operation of this magnitude would, of necessity, generate business records substantiating what
25  expenses were incurred.  Similarly, if plaintiff in fact spent several million dollars of his own
    money, bank records must exist showing checks, withdrawals, and other movement of money in
26  and out of his accounts.  The same is true of any grant monies plaintiff received in connection
    with development of the products.  If grants were made, records should exist.  Finally, laboratory
27  and other third party charges would have been invoiced or documented in some fashion.  The
28  mere fact that "intellectual property" is involved does not mean these records were not created or

23

1  *Augle*, 757 F.2d 157, 161-63 (7th Cir. 1985) (directing the district court to remit the damages

2  award or grant a new trial, noting, *inter alia*, that "[a]lthough at argument . . . [his] counsel

3  stated that [plaintiff] had required elaborate dental reconstruction, no bills for dental work were

4  put into evidence. . . . A plaintiff is not permitted to throw himself on the generosity of the jury.

5  If he wants damages, he must prove them"); *Atchison, Topeka and Santa Fe Railway Co. v.*

6  *Hadley Auto Transport*, 216 F.Supp. 94, 96 (D.Colo. 1963) (granting a new trial because plaintiff

7  proffered only his own opinion in support of claimed amount of property damage, and because

8  he offered no physician testimony regarding his physical condition).

9       Given the absence of any corroborating evidence, and the lack of specificity in plaintiff's

10 testimony, the court concludes that the testimony is entitled to little, if any, weight. See *Santana*

11 *v. United States*, 572 F.2d 331, 335 (1st Cir. 1977) (a trial judge "is not compelled to accept a

12 plaintiff's testimony even if uncontradicted. The plaintiff has the burden of proof and the trial

13 judge may find that the testimony does not carry that burden); *Glimco v. Commissioner of Internal*

14 *Revenue*, 397 F.2d 537, 540 (7th Cir. 1968) (same); *Ramos v. Matson Navigation Co.*, 316 F.2d

15 128, 132 (9th Cir. 1963) (same). Consequently, to the extent the jury's verdict was based on

16 plaintiff's statement that he spent $12 million developing the prime materials, it is contrary to the

17 great weight of the evidence. Therefore, unless plaintiff accepts a remittitur of the award, the

18 court will grant Cedars a new trial.[90]

19 ——————————

20 need not have been produced.

21     [90]Cedars asserts that a new trial is also warranted because the evidence introduced at trial

22 does not support a finding that its breach of contract caused plaintiff's damages. Specifically, Cedars contends the evidence shows that plaintiff had copies of the prime materials in his

23 possession until at least 1999. Thus, it argues that its alleged failure to return the materials could not have caused his purported $12 million loss. The evidence in the record on this subject is not

24 altogether clear. Plaintiff testified that more than one serum was needed to treat HIV, since the disease changes rapidly, and all strains of the virus in a patient's system must be attacked. (RT

25 at 139.) He said that he has developed fifty such products, and that he gave thirty-six of them to

26 Cedars to test. (*Id.* at 147-48.) Initially, plaintiff stated that he retained one copy of each of the prime materials he gave to Cedars. (*Id.* at 148.) Later, he testified that he retained copies of only

27 some of the prime materials, and that these remained in his possession until someone broke into his laboratory and destroyed them. (*Id.* at 356.) Dr. Manuel Noriega testified that he treated

28

1               **d.    Testimony   Regarding   The   Value   Of   The   Prime**

2               **Materials/Plaintiff's Idea**

3       Under California law, the measure for contract damages is "the amount which will

4 compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the

5 ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300.  The goal

6 of contract damages is to compensate a plaintiff for his or her loss by providing the "equivalent

7 of the benefits of performance . . . as nearly as possible." *Brandon & Tibbs v. George Kevorkian*

8 *Accountancy Corp.*, 226 Cal.App.2d 442, 455 (1990).  See also *Postal Instant Press, Inc. v.*

9 *Sealy*, 43 Cal.App.4th 1704, 1708-09 (1994) ("Under general contract principles, when one party

10 breaches a contract the other party ordinarily is entitled to damages sufficient to make that party

11 'whole,' that is, enough to place the nonbreaching party in the same position as if the breach had

12 not occurred"); *Overgaard v. Johnson*, 68 Cal.App.3d 821, 824 (1977).

13       Plaintiff's assertion that Cedars failed to return his prime materials is analogous to the

14 breach of a bailment contract.[91]  A bailee breaches such a contract by failing to return the bailed

15 property to its owner. *Gebert, supra*, 172 Cal.App.2d at 589.  Courts assess damages for breach

16 of a bailment contract under the general provision governing contract damages, Civil Code

17

18

---

19 approximately one hundred patients with plaintiff's products between 1996 and 1999.  He said that

20 he stopped his treatments only in 1999 when the "original cultures" were lost.  (*Id.* at 861.)  The

21 jury could have concluded that the products Dr. Noriega used to treat patients derived from

certain of the cultures plaintiff did not give to Cedars or from cultures that were developed after

22 1996.  Given the state of the evidence on this subject, the court cannot say that a finding to this

23 effect would have contrary to the clear weight of the evidence.

24     [91]A bailment is an express or implied contract in which a party deposits personal property

with another party for a particular purpose. See *Gebert v. Yank,* 172 Cal.App.3d 544, 588 (1985)

25 (citing California Civil Code § 1813, which addresses bailments or "deposits"); Cal. Civ. Code

§ 1814 ("A voluntary deposit is made by one giving to another, with his consent, the possession

26 of personal property to keep for the benefit of the former. . .").  See also *Whitcombe v.*

27 *Stevedoring Servs. of America*, 2 F.3d 312, 316 (9th Cir. 1993) ("California law generally defines

a bailment as the delivery of a thing in trust for a purpose upon an implied or express contract");

28 *Greenberg Brothers, Inc. v. Hahn*, 246 Cal.App.2d 529, 531 (1966).

1  § 3300.[92]  Consequently, bailment damages are generally awarded only to the extent they are

2  within the contemplation of the parties at the time they entered into the contract.  See *Windeler*

3  *v. Scheers Jewelers*, 8 Cal.App.3d 844, 851 (1970).  Additionally, a bailor is not liable for

4  damages beyond those about "which he is informed by the depositor or [beyond the amount he]

5  has reason to suppose[ ] the thing deposited to be worth." Cal.Civ.Code § 1840.  If a bailee does

6  not inform the bailor of an item's value, he may only recover the market value of the property.

7  See *Greenberg Brothers*, *supra*, 246 Cal.App.2d at 534; *Windeler*, *supra*, 8 Cal.App.3d at 855.

8      Here, plaintiff equated the current value of the prime materials with the costs allegedly

9  incurred in developing them.[93]  There was no evidence that such costs represented the market

10  value of the products, and plaintiff's testimony in this regard was thus legally inadequate to

11  support the damages award.[94]  Moreover, even if legally adequate, it was contrary to the clear

---

13  [92]A plaintiff can recover conversion damages if a defendant fails to return his or her

14  property.  Plaintiff, however, pled only breach of contract claim; thus, the tort measure of damages for conversion is inapplicable.

16  [93]Specifically, he testified that the loss he had suffered as a result of the alleged

17  misappropriation of his idea was "all the money [he] spent in developing the sera, first[, and] . . . all the money that could be raised by bringing the sera to market which is billions." (RT at 381.)

18  [94]Defendants are incorrect that plaintiff was not competent to testify to the value of the

19  prime materials.  An owner may testify to the value of his or her property.  See *White v. Atlantic Richfield Co.,* 945 F.2d 1130, 1133 (9th Cir. 1991) ("An owner may testify as to the reasonable

20  value of the land"); *Shane v. Shane*, 891 F.2d 976, 982 (1st Cir. 1989) ("in testifying as to the value of his property, an owner is entitled to the privileges of an expert"); *United States v.*

21  *10,031.98 Acres of Land*, 850 F.2d 634, 636 (10th Cir. 1988) (an owner may offer such testimony "without further qualification"); *Meredith v. Hardy*, 554 F.2d 764, 765 (5th Cir. 1977);

22  *United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966); *Betts v. Atwood Equity Cooperative*

23  *Exchange*, 1990 WL 252144, *2 (D.Kan. Dec. 24, 1990) ("The law is well-settled under the Federal Rules of Evidence that the owner of property is qualified by his ownership alone to testify

24  as to its value").  The accuracy or credibility of the owner's testimony affects the weight, not the admissibility, of the testimony.  See *White, supra,* 945 F.2d at 1133; *Shane, supra,* 891 F.2d at

25  982; *Meredith, supra,* 554 F.2d at 765; *LaCombe v. A-T-O, Inc.,* 679 F.2d 431, 434 (5th Cir.

26  1982) (an owner's testimony is "subject to attack" through cross-examination).  See also *Windeler, supra,* 8 Cal.App.3d at 852 (plaintiff's testimony regarding the value of the rings was adequate,

27  since property owners may estimate the value of their property: "The credit and weight to be given such evidence and its effect, as well as the resolution of the conflicts between the testimony of an

28

1 weight of the evidence for the reasons stated above. Thus, to the extent the jury's verdict was

2 based on this evidence, plaintiff must accept a remittitur or the court will grant a new trial.

3       Similarly, plaintiff's testimony that the products would have a value of "billions" if brought

4 to market cannot support the jury's verdict. First, as noted above, plaintiff was not qualified to

5 testify to the value the products would have had once introduced in the American market.[95]

6 Moreover, no evidence in the record suggests that it was reasonably certain the products would

7 be introduced to the market. Consequently, because any award based on this testimony was

8 completely speculative, plaintiff must accept a remittitur or the court will grant defendants a new

9 trial. See *McClaran v. Plastic Industries, Inc.*, 97 F.3d 347, 354 (9th Cir. 1996) ("We remand

10 for a new trial on damages because McClaran's proof of damages was speculative"); *Collier v.*

11 *Hoisting & Portable Engineers Local Union No. 101*, 761 F.2d 600, 603 (10th Cir. 1985) ("it is

12 within the trial court's discretion to order a new trial on damages alone when the jury's award is

13 speculative or excessive").

14              **e.**     **Lack Of Foreseeability**

15       Under *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854), damages must be

16 foreseeable before they may be recovered on a breach of contract claim.[96] Civil Code § 3300

17

---

18 owner as to value and that of an expert witness is for the trier of fact"). The cases Cedars cites

19 as support for the proposition that it was necessary for plaintiff to qualify as an expert to testify

20 to the value of the prime materials are distinguishable. In those cases, third party witnesses,

21 rather than owners, were attempting to testify to the value of property. Thus, they had to qualify

as experts. See *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 1004 (Fed. Cir. 1995);

22 *Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 733 (8th Cir. 1995); *In Re Independent Serv. Orgs.*

*Antitrust Litigation*, 85 F.Supp.2d 1130, 1163 (D.Kan. 2000).

23     [95]See *id.* at 370, 381. "Brought to market" in this context means FDA-approved. The court

24 precluded plaintiff from testifying as an expert regarding the value the products would have once

they were FDA-approved because he had not been designated as an expert on this issue and had

25 not been qualified to express opinions concerning it. Moreover, plaintiff's testimony established

that he lacked the personal knowledge necessary to express a lay opinion on the subject.

26

27     [96]The parties debate whether the $10.1 million award represents general or special

damages. The issue, however, is not whether the damages "are for the loss of the subject matter

28 of the contract itself," as plaintiff contends, but rather whether such damages were foreseeable at

1  codifies the *Hadley* rule.  See *Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 797 (9th Cir. 1990)

2  ("The California courts have interpreted [§ 3300] as incorporating the limiting rule of *Hadley v.*

3  *Baxendale*"); *Landsberg v. Scrabble Crossword Game Players*, 802 F.2d 1193, 1198 (9th Cir.

4  1986).  Thus, only damages that are "reasonably contemplated or foreseen by the parties at the

5  time they contracted" are permissibly awarded.  *Kern, supra*, 899 F.2d at 797 (citing *Glendale*

6  *Federal Savings & Loan Ass'n v. Marine View Heights Dev. Co.*, 66 Cal.App.3d 101, 125

7  (1977)).  See also *Earth Elements, Inc. v. National American Ins. Co. of California*, 41

8  Cal.App.4th 110, 115 (1996) ("'[I]nterpreting the two sections of the Civil Code [sections 3300

9  and 3333], the rule clearly applicable is that measuring the scope of recoverable damages in

10  breach of contract cases must be restricted to such damages as were actually contemplated by or

11  within the reasonable contemplation of the parties at the time they entered into the contract'");

12  *Brandon & Tibbs, supra*,  226 Cal.App.3d at 455-56; *T.L. Martin v. U-Haul Co. of Fresno*, 204

13  Cal.App.3d 396, 409 (1988) ("Damages must be reasonable . . . and the promisor is not required

14  to compensate the injured party for injuries that he had no reason to foresee as the probable result

15  of his breach when he made the contract").  "This limitation on available damages serves to

16  encourage contractual relations and commercial activity by enabling parties to estimate in advance

17  the financial risks of their enterprise." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7

18  Cal.4th 503, 515 (1994) (distinguishing tort damages, which are designed to compensate a victim

19  for injury suffered).

20      Lack of foreseeability is an appropriate basis upon which to grant a new trial.  See *999 v.*

21  *C.I.T. Corp.*, 776 F.2d 866, 871-72 (9th Cir. 1985) (considering defendant's argument that

22  damages were not foreseeable in deciding whether to remand for a new trial); *First*

23

24  the time of the contract.  See RESTATEMENT 2d, Contracts, § 351 (stating that the terms "special"

25  and "consequential" damages are "often misleading . . . and it is not necessary to distinguish

     between 'general' and 'special' or 'consequential' damages for the purpose of the rule stated in

26  this Section"); *Ebasco Servs., Inc. v. Pennsylvania Power & Light Co.*, 460 F.Supp. 163, 213,

     n. 62 (E.D.Pa. 1978) ("Th[e] distinction (between general and special damages) is not a clear one

27  and would turn on what damages were contemplated by the parties at the time the contract was

28  entered").

28

*Commonwealth Corp. v. Hibernia National Bank of New Orleans*, 891 F.Supp. 290, 297-98 (E.D.La. 1995) (evaluating whether damages were foreseeable in the context of a motion for new trial).

Here, nothing in the record suggests that damages of $12 million were foreseeable to Cedars at the time it entered into the contract. Plaintiff testified that he gave the prime materials to Cedars for cataloguing and storage. He did not state that he told Daar, Melmed, or any other Cedars' representative that these were the only copies of the materials available, or that they cost $12 million to create. None of the parties' written communications contain any hint of either fact.

Plaintiff asserts that Cedars must have known the value of the materials given the presentation he made to Melmed and Daar, and given Melmed's statement that he was "impressed by [plaintiff's] devoted success in tackling such difficult clinical problems."[97] Contrary to plaintiff's argument, it is difficult to read a great deal into Melmed's comment, since it appears to be nothing more than a polite introduction to the balance of the letter that follows. As respects the meeting, plaintiff testified that he made a "very detailed presentation" to Melmed and Daar regarding his technology and its applications[98] during a meeting that lasted "probably close to two" hours.[99] Plaintiff stated that he had slides and X-rays, as well as patient case histories, at the meeting.[100] Given the nature of the conversation, plaintiff asserts, Cedars knew that development of the products was his life's work. From this he concludes it was also on notice that the damages attributable to any failure to return the prime materials could be as much as $12 million.

This contention suffers from the same problem as plaintiff's evidence supporting the $12 million figure. Assuming Cedars was on notice that plaintiff spent years working to develop the products, this is not equivalent to notice that he had expended $12 million doing so. Compare

---

[97]TE 11. During the hearing, plaintiff characterized Melmed's statement as "You spent years developing this stuff and we're proud to be allowed to test it."

[98]RT at 133.

[99]*Id.* at 134.

[100]*Id.* at 135.

1   *Windeler*, *supra*, 8 Cal.App.3d at 852 (because plaintiff told the jeweler her rings had sentimental

2   value — a "special circumstance known to both parties at the time the contract was entered into"

3   — the court held she could recover not only their value, but damages for physical suffering as

4   well).

5        Consequently, there is no evidence that Cedars knew it had been given possession of items

6   worth millions of dollars, or that it was reasonably foreseeable Cedars would be liable for such

7   an amount if it failed to return the items.  For this reason as well, the jury award is legally

8   insupportable and contrary to the weight of the evidence.[101]

9

10   [101]The disproportionality of the award and the contract price provides further support for
the court's conclusion that a new trial is warranted.  Where there is an extremely disproportionate

11   relationship between the damages awarded and the contract price, even foreseeable damages are
not recoverable because it suggests that the party being held liable did not assume such a risk.

12   See *International Ore & Fertilizer Corp. v. SGS Control Servs. Inc.*, 743 F.Supp. 250, 257

13   (S.D.N.Y. 1990) (citing RESTATEMENT 2d, Contracts, § 351, comment f).  See Cal. Civ. Code
§ 3359 (damages must be reasonable and not "unconscionable and grossly oppressive" or "contrary

14   to substantial justice"); *Postal Instant Press*, *supra*, 43 Cal.App.4th at 1715 (§ 3359 limits both

15   tort and contract damages).  As explained in *Vitol Trading S.A. v. SGS Control Servs.*, 874 F.2d
76 (2nd Cir. 1989):

16       "The conclusion that SGS had no notice of potential special damages — and would

17       be surprised to find it had assumed the risk of being liable for them — is further
    strengthened by comparison of Vitol's asserted damages to the fee SGS charged for

18       the GC test: $547,688 to $220, a ratio of approximately 2,000 to one.  This
    enormous disparity between the fee SGS charged Vitol and the damage liability

19       SGS allegedly assumed is persuasive evidence that assumption of that risk was not

20       within SGS's contemplation at the time it agreed to perform the testing.  If, as a
    rational economic actor, SGS intended to assume that risk, plainly it would have

21       charged substantially more for its testing services.  Or, it might have turned down
    Vitol's request altogether rather than risking so large a liability for a pittance." *Id.*

22       at 81 (citation omitted).

23       Here plaintiff paid $11,250 to have Cedars test his products.  He paid nothing for the for
cataloguing and storage function Cedars allegedly undertook to perform.  Plaintiff sought $12

24   million in damages, and was awarded $10,111,250.  As in *Vitol Trading* and *International Ore*,

25   there is a great disparity between the contract price and the damages awarded, i.e., a ratio of
almost 900 to one.  This lends credence to the conclusion that this level of damages was not

26   foreseeable to Cedars at the time it entered into the contract.  See *Evra Corp. v. Swiss Bank*

27   *Corp.*, 673 F.2d 951, 956 (7th Cir. 1982) (explaining the relationship between disproportionality
and foreseeability, and stating that "Swiss Bank did not have enough information to infer that if

28   it lost a $27,000 payment order it would face a liability in excess of $2 million" ).  Here, there

### 3.    Remittitur

Where there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive verdict.  See *Pershing Park Villas Homeowners Ass'n. v. United Pacific Ins. Co.*, 219 F.3d 895, 905 (9th Cir. 2000); *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir. 1987).  Under such circumstances, the court may issue a order conditioning a new trial on plaintiff's rejection of a reduced amount of damages.  See *Seymour*, *supra*, 809 F.2d at 1387 ("The prevailing party is given the option of either submitting to a new trial or of accepting a reduced amount of damage which the court considers justified").

In the present case, there is no evidence that the jury's award was the result of prejudice or passion.  Thus, the court will offer plaintiff the option of accepting remitted damages of $11,250 within thirty days of the date of this order.  If plaintiff declines to accept such an award, Cedars' motion for new trial will be granted.  See *Linn v. United Plant Guard Workers of America*, 383 U.S. 53 (1966) ("If the amount of damages awarded is excessive, it is the duty of the trial judge to require a remittitur or a new trial").

was no evidence that Cedars knew of the costs plaintiff had incurred to develop the products and determined, in the face of that knowledge, to assume the risk of storing them.  Moreover, there is no written documentation regarding the storage and cataloguing function.  See *International Ore*, *supra*, 743 F.Supp. at 257 ("informality of dealing, including the absence of a detailed written contract," suggests the parties did not "careful[ly] attempted to allocate the risks," citing RESTATEMENT 2d, Contracts, § 351, comment f).  Consequently, the ratio between contract price and damages provides a further basis for concluding that the jury's verdict is excessive and contrary to the clear weight of the evidence.

### III. CONCLUSION

For the foregoing reasons, defendant's renewed motion for judgment as a matter of law is denied. Defendant's motion for a new trial is granted unless plaintiff accepts remitted damages of $11,250. Plaintiff has thirty (30) days from the date of this order to inform the court of his decision.

DATED: November 20, 2000

_Margaret M. Morrow_
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE