ENTER NO JS-6 SEND

FILED
CLERK, U.S. DISTRICT COURT

SEP 2 0 2001

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

ENTERED
CLERK, U.S. DISTRIC. COURT

OCT 3 - 2001

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. SAMIR CHACHOUA, | ) CASE NO. CV 97-05595 MMM (CTx) |
| Plaintiff, | ) |
| vs. | ) ORDER GRANTING DEFENDANT'S |
| | ) MOTION FOR PARTIAL SUMMARY |
| | ) JUDGMENT AND DENYING |
| CEDARS-SINAI MEDICAL CENTER, | ) PLAINTIFF'S MOTION TO REOPEN |
| et al., | ) DISCOVERY |
| Defendants. | ) |

This action concerns sera and vaccines ("products")[1] developed by Dr. Samir Chachoua, which were submitted to Cedars-Sinai Medical Center ("Cedars") for testing to assess their efficacy in combating the HIV virus. A claim against Cedars for breach of contract, and a claim against Cedars and Dr. Eric Daar for conspiracy to defame proceeded to trial on August 1, 2000. The jury found for Cedars and Daar on the conspiracy to defame claim, but returned a verdict of $10,111,250 against Cedars on the breach of contract claim.

Cedars moved for a new trial, asserting that there was insufficient evidence of a contract between the parties, insufficient evidence of breach, and insufficient evidence to support the

---

[1] Dr. Chachoua testified during the first trial in this action that "products" best describes the therapies he has developed, since some are sera (blood products) while others are vaccines. See Reporter's Transcript of Proceedings ("RT") at 113.

Docketed
Copies NTC Sent
JS - 5 / JS - 6
JS - 2 / JS - 3
CLSD

554

damages award. Plaintiff moved for new trial on the conspiracy to defame claim. As respects Cedars' motion, the court held that there was sufficient evidence from which the jury could have concluded that Cedars had a contract with plaintiff and that it breached that contract. It found, however, that the $10,111,250 damages award was contrary to the clear weight of the evidence, and that it may have included damages that were speculative and/or not legally recoverable for breach of contract. Consequently, it remitted plaintiff's damages to $11,250, and indicated that, if plaintiff did not accept entry of judgment in that amount, Cedars' motion for new trial would be granted. The court denied plaintiff's motion for new trial on the conspiracy to defame count, holding that its exclusion of evidence under Rule 801(d)(2)(E) was not legally erroneous, and that the statements and conduct of a Cedars' employee who had had judgment entered in his favor on the conspiracy claim could not be imputed to Cedars. Following these rulings, plaintiff rejected the remittitur and opted for a new trial.

On May 18, 2001, plaintiff moved for leave to file a fifth amended complaint adding new defendants and several new claims for relief. The court denied this motion on June 13, 2001, and set a trial date of October 9, 2001. Cedars then filed a motion for partial summary judgment on the issue of damages, and plaintiff filed a motion to reopen discovery. Both motions were heard on August 27, 2001.

## I. DISCUSSION

### A.   Defendant's Motion For Partial Summary Judgment

#### 1.   Legal Standard Governing Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses which demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party

1  will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that

2  no reasonable trier of fact could find other than for the moving party.  On an issue as to which

3  the nonmoving party will have the burden of proof at trial, however, the movant can prevail

4  merely by pointing out that there is an absence of evidence to support the nonmoving party's case.

5  See *id.*  If the moving party meets its initial burden, the nonmoving party must then set forth, by

6  affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue

7  for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); FED.R.CIV.PROC. 56(e).

8         In judging evidence at the summary judgment stage, the court does not make credibility

9  determinations or weigh conflicting evidence.  Rather, it draws all inferences in the light most

10 favorable to the nonmoving party. See *T.W. Electric Service, Inc. v. Pacific Electric Contractors*

11 *Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).  The evidence presented by the parties must be

12 admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving

13 papers is insufficient to raise genuine issues of fact and defeat summary judgment.  See *Falls*

14 *Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub. Co., Inc.*

15 *v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

16            **2.    Defendants Are Entitled To Summary Judgment On Damages**

17        Cedars bases its motion for partial summary judgment as to damages on the assertion that,

18 as a matter of law, Chachoua is not entitled to recover the cost or value of his "sera" and "prime

19 materials," or any lost grant monies.[2] Cedars contends, *inter alia*, that such items were not within

20 the contemplation of the parties at the time they entered into the contract, that they are speculative

21 and thus not recoverable, and that Chachoua can adduce no evidence supporting the damages

22 claims he makes.  Consequently, Cedars asserts, Chachoua's damages should be limited to

23 $11,250.00 – the contract price for testing the sera.  Chachoua counters that there are questions

24 of material fact that preclude the entry of partial summary judgment.

25

26

27        [2]See Defendant's Memorandum of Points and Authorities in Support of Motion for

28 Summary Adjudication ("Def.'s Mem.") at 3:14-16.

### 3.     Standard Governing Contract Damages

Under California law, damages for breach of contract should be awarded in "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." CAL. CIV. CODE § 3300. The goal of contract damages is to compensate a plaintiff for his or her loss by providing the "equivalent of the benefits of performance . . . as nearly as possible." *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal.App.2d 442, 455 (1990). See also *Postal Instant Press, Inc. v. Sealy*, 43 Cal.App.4th 1704, 1708-09 (1994) ("Under general contract principles, when one party breaches a contract the other party ordinarily is entitled to damages sufficient to make that party 'whole,' that is, enough to place the nonbreaching party in the same position as if the breach had not occurred").

Generally, contract damages are limited to those within the contemplation of, or reasonably foreseeable to, the parties at the time they enter into the contract. See *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 515 (1994).   These type of damages are aptly denominated "general damages." See *id.* See also *Resort Video, Ltd. v. Laser Video, Inc.*, 35 Cal.App.4th 1679, 1697 (1995) ("general damages are ordinarily confined to those which would naturally arise from the breach, or which might have been reasonably contemplated or foreseen by both parties, at the time they made the contract, as the probable result of the breach").

In certain cases, however, plaintiffs also may recover "special damages" for breach of contract – if, for example, the circumstances caused an unusual injury, and those circumstances were or should have been known to the breaching party when the contract was formed. See *id.* See also *Automatic Poultry Feeder Co. v. Wedel*, 213 Cal.App.2d 509, 513 (1963) ("However, the general principle embraced in the section does find application to the situation presented by the record, because the plaintiff is not suing for what would normally be considered general damages but only for what would usually be termed special damages, that is to say, his loss of profits or bonus, and it is a general rule with respect to a claim for special damages arising from circumstances peculiar to the particular case that notice of such special factors must be communicated to or known by the other party at the time the contract is made in order to hold him

4

1   liable therefor").

2   "The requirement of knowledge or notice as a prerequisite to the recovery of special

3   damages is based on the theory that a party does not and cannot assume limitless responsibility

4   for all consequences of a breach, and that at the time of contracting he must be advised of the

5   facts concerning special harm which might result therefrom, in order that he may determine

6   whether or not to accept the risk of contracting." *Kevorkian, supra,* 226 Cal.App.3d at 456. In

7   addition to proving knowledge, a plaintiff seeking special damages such as lost profits must

8   demonstrate "as a reasonable probability, [that] profits would have been earned on the contract

9   except for its breach." *Id.* at 468.

10   With these standards in mind, the court considers whether, as a matter of law, Chachoua

11   is precluded from recovering the types of damages challenged by Cedars.

### 4.   Future Grant Monies

13   Cedars argues first that partial summary judgment should be granted as respects

14   Chachoua's right to recover lost future grant monies on the breach of contract claim. Cedars

15   maintains that such funds would be special damages, asserting that the record is devoid of any

16   competent evidence that it knew the loss of such monies was reasonably likely to flow from a

17   breach of the testing contract. Additionally, Cedars contends there is no evidence that it was

18   reasonably probable Chachoua would have received such monies but for the breach of contract,[3]

19   and no evidence such damages have in fact been suffered. Finally, Cedars maintains that

20   Chachoua has waived his right to seek such damages on the breach of contract claim, as he did

21   not oppose Cedars' motion in limine seeking to exclude evidence of special damages, including

22   lost grant monies, and specifically stated that he sought to recover such damages only in

23   connection with the conspiracy to defame claim.[4] The court notes that Chachoua expressly

24   reiterated this position in his brief opposing a new trial on the contract claim.

25

26   [3]See *id.* at 9.

27   [4]See Defendant's Memorandum of Points and Authorities in Reply to Opposition to Motion

28   for Summary Judgment ("Def.'s Reply") at 3.

1    Chachoua counters that the evidence in the record is sufficient to create a triable issue of

2  fact regarding his right to recover lost grant monies.[5]  Chachoua has submitted a declaration in

3  which he states that he lost approximately $82 million in grant monies from various sources as

4  a result of Cedars' breach of the testing contract.[6]  Chachoua also states that, before contracting

5  _____

6    [5]See Plaintiff's Memorandum of Points and Authorities in Opposition to Motion for

7  Summary Judgment ("Pl.'s Opp.") at 15.

8    [6]See Declaration of Samir Chachoua ("Chachoua Decl."), ¶ 17.  Chachoua's declaration
   as submitted to the court is not signed and does not contain a paragraph 17.  Cedars, however,
9  filed evidentiary objections to the statement, asserting that Chachoua lacks personal knowledge
   of the facts to which he purports to testify, that the statement is conclusory, and that it lacks
10  foundation.   (See Defendant's Evidentiary Objections and Request to Strike Portions of
   Declaration of Samir Chachoua and Exhibits Thereto ("Def.'s Evid. Objs."), ¶ J.)  Chachoua's
11  declaration is inadmissible for another reason – he failed to sign it.  See FED.R.CIV.PROC. 56(e)
12  ("When a motion for summary judgment is made and supported as provided in this rule, an
   adverse party may not rest upon the mere allegations or denials of the adverse party's pleading,
13  but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth
14  specific facts showing that there is a genuine issue for trial.  If the adverse party does not so
   respond, summary judgment, if appropriate, shall be entered against the adverse party").  See also
15  Pfeil v. Rogers, 757 F.2d 850, 859 (7th Cir. 1985) ( "Affidavits are admissible in summary
16  judgment proceedings if they are made under penalties of perjury; only unsworn documents
   purporting to be affidavits may be rejected"); Moreno v. City and County of San Francisco, No.
17  C 92-0747 FMS, 1994 WL 46735, *5 (N.D. Cal. Feb. 2, 1994) (rejecting plaintiff's unsigned
18  declaration on the ground that "[a]ffidavits and declarations offered in support of or opposition
   to a motion must be properly authenticated by persons with personal knowledge through whom
19  they could be properly introduced at trial").  Cf. United States v. 1995 Jeep Cherokee, No.
20  97-35906, 1999 WL 51505, *1 (9th Cir. Jan. 22, 1999) (Unpub. Disp.) (refusing to disregard
   Bone's unsigned affidavit since "Bone began the affidavit by stating that he has 'first duly sworn
21  on oath,' and the notary states that the affidavit was 'subscribed and sworn to' before her").  On
22  the assumption that Chachoua could submit an executed, complete copy of his declaration,
   however, the court has considered the purported substance of the pleading.
23    As respects Cedars' specific objection to this statement, it is sustained to the extent
24  Chachoua offers it to prove that he in fact had been promised $82 million in grant monies.  The
   statement is nothing more than a conclusory assertion unsupported by evidentiary facts.  Thus,
25  it is not sufficient to raise a triable issue of fact regarding Chachoua's receipt – contingent or
   otherwise – of grant funds and the loss of those funds following Cedars' alleged contract breach.
26  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot
27  be defeated by relying solely on conclusory allegations unsupported by factual data"); Falls
   Riverway Realty, 754 F.2d at 56 ( conclusory statements unsupported by evidentiary facts will not
28  suffice to defeat a motion for summary judgment).

with Cedars, he told Drs. Melmed and Daar about the grant monies:

> "Dr.'s [sic] Melmed and Daar and I agreed that grants would be facilitated if donors were aware of Cedars testing. They provided me with the To Whom It May Concern letter. During the discussion, available grant money for this work was mentioned. I stated that grants in the vicinity of $100,000,000.00 were available and would be facilitated by knowledge of testing at Cedars and successful results. Daar and Melmed agreed, but added that they would be able to access much larger funds in order to facilitate FDA approval. I stated that once brought to market, the revenue would be in the billions of dollars. Both Daar and Melmed agreed . . . . Dr. Daar told me he was aware of grants and faced me copies of formats for a grant application."[7]

---

[7]Chachoua Decl., ¶ 5.  Defendant objects to several portions of ¶ 5 of Chachoua's declaration.  (See "Def.'s Evid. Objs., ¶¶ C-D.)  To begin, Cedars objects to each of the provisions concerning the agreements made between Drs. Daar and Melmed and plaintiff on the grounds of speculation and lack of foundation as to what Drs. Daar and Melmed thought.  (See *id.*, ¶ C.)  However, plaintiff's declaration does not say anything about the state of mind of Daar and Melmed, but instead provides evidence as to the terms of the oral agreement between plaintiff and Cedars.  There is no basis for excluding such evidence from the record, and the court accordingly overrules this objection.  Additionally, Cedars objects to the following sentence in ¶ 5: "Dr. Daar told me he was aware of grants and faxed me copies of formats for a grant application."  (*Id.*, ¶ D.)  Specifically, defendant argues that (1) this statement lacks specific facts as required by Rule 56(e) of the Federal Rules of Civil Procedure, and (2) this statement is not the best evidence of the content of the fax under Rule 1002 of the Federal Rules of Evidence.  (See *id.*)  As respects the first argument, Rule 56(e) provides in pertinent part that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  (FED.R.CIV.PROC. 56(e))  Because plaintiff would have personal knowledge of what Dr. Daar told him and faxed him, this objection is overruled.  As for best evidence objection, rule 1002 provides that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress."  (FED.R.EVID. 1002.)  This rule is not applicable here, however, because Chachoua is not attempting to prove the content of the document, but only that Daar faxed it to him.  (See, e.g., *Fireman's Fund Ins. Co. v. Stites*, No. 99-56622, 2001 WL 872831, *6 (9th Cir. Aug. 3, 2001) ("Finally, the 'best evidence' rule embodied in Rule 1002 is inapposite, because the checks and billing records the Insurers submitted were not offered to prove 'the content of a writing' as required by the rule")) Consequently, this objection is also overruled.

1    While Chachoua did not testify to this aspect of his conversation with Melmed and Daar

2 during the first trial, he did not testify to the contrary either. Consequently, the declaration does

3 not "contradict" Chachoua's prior testimony, and may be considered in deciding this motion.

4 See, e.g., *Palazzo v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) (the rule that a declaration

5 contradicting prior deposition testimony cannot be used to create a triable issue of fact "does not

6 apply if the deposition and the later sworn statement are not actually contradictory. . . . Thus, it

7 does not apply where the later sworn assertion addresses an issue that was not, or was not

8 thoroughly or clearly, explored in the deposition"); *Langman Fabrics v. Graff Californiawear,*

9 *Inc.*, 160 F.3d 106, 112 (2d Cir. 1998) ("'[a]lthough a party does not show a triable issue of fact

10 merely by submitting an affidavit that disputes his own prior sworn testimony, a material issue

11 of fact may be revealed by his subsequent sworn testimony that amplifies or explains, but does

12 not merely contradict, his prior testimony, especially where the party was not asked sufficiently

13 precise questions to elicit the amplification or explanation,'" quoting *Rule v. Brine, Inc.*, 85 F.3d

14 1002, 1011 (2d Cir. 1996)); *Messick v. Horizon Indus., Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995)

15 (stating that, even under the "sham affidavit" doctrine, the non-moving party is not precluded

16 from elaborating upon, explaining or clarifying prior testimony); *Rodgers v. County of Yolo –*

17 *Sheriff's Department*, 889 F.Supp. 1284, 1288-89 (E.D. Cal. 1995) ("Since her declaration . .

18 . does not directly contradict her deposition testimony, it may be considered in resolution of the

19 motion"); *Hammill v. Albemarle County School Board*, 1994 WL 147753, *7, n. 2 (W.D. Va.

20 April 18, 1994) ("While the court can refuse to consider a contradicting affidavit, . . . an affidavit

21 containing supplemental material is acceptable on motion for summary judgment").  See also

22 *Favreau v. Chemcentral Corp.*, 107 F.3d 877, 1997 WL 85281, * (9th Cir. Feb. 27, 1997)

23 (Unpub. Disp.) (noting the general rule that "'a party cannot create an issue of fact by an affidavit

24 contradicting his prior deposition testimony,'" but observing that the "rule does not . . .

25 automatically dispose of every case involving a contradictory affidavit.  It is limited to '"sham"

26 testimony that flatly contradicts earlier testimony in an attempt to "create" an issue of fact and

27 avoid summary judgment,'" quoting and/or citing *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262,

28 266 (9th Cir. 1991) (citing *Foster v. Arcata Associates, Inc.*, 772 F.2d 1453, 1462 (9th Cir.

1   1985); and *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 543-44 (9th Cir.1975)).

2   While Chachoua testified at length regarding his meeting with Melmed and Daar, and never once

3   mentioned that he told them he had grant funds of $100 million "available," he was never

4   specifically asked whether this subject was addressed during the meeting, and the court will not

5   exclude the statement from consideration on summary judgment as a result.

6       Chachoua's testimony that he told Melmed and Daar about the "available" grants, and

7   stated that their receipt would be "facilitated" if Cedars' testing proved the efficacy of the

8   products is sufficient to raise a triable issue of fact as to whether it was reasonably foreseeable to

9   Cedars, and/or within its contemplation, that a breach of the contract might result in the loss of

10  these monies.  Chachoua's submission of the trial testimony of Michael Pope and Bo Hallgren is

11  also sufficient to raise a triable issue of fact as to the amount of the grant monies purportedly lost.

12      Those witnesses' testimony, however, establishes that any damages award of this type

13  would be speculative.  Pope testified that, before his organization, the Save A Life Foundation,

14  heard negative publicity regarding Chachoua, it had obtained commitments of approximately $10

15  million to fund his research.[8]  Specifically, Pope stated:

16          "The board of directors for Save A Life Foundation, two of the members were

17          quite well off and had committed approximately $5 million.  We had gone to a

18          company called Gloss and Company [which] solicits monies for research and they

19          had investors that were willing to submit another $5 million to further this

20          research."[9]

21  Similarly, Bo Hallgren testified that his organization, the Santa Monica Patient's Association,

22  undertook to raise money to fund Chachoua's research, and, in fact raised approximately

23  $300,000, which was used to pay the "costs for the vaccines and other stuff."[10]  Hallgren also

24  testified that the mother of "Mats" – a patient who was a member of the association – initially

---

26      [8]See RT at 782-83.

27      [9]*Id.*

28      [10]*Id.* at 870: 4.

9

1   promised $4½ million, and later an additional $60 million, for treatment and research.  Hallgren

2   said the organization was committed "to take the money from her and give it to Dr. Chachoua for

3   him to use as he would like."[11]

4          While Pope and Hallgren both testified that various individuals "committed" to donate

5   monies in these "approximate" amounts to Chachoua, there is no evidence that the monies were

6   in fact delivered to the intermediary organizations, nor that the individuals involved were under

7   any obligation actually to provide the funds.  Rather, both witnesses phrased their answers in

8   terms of "promises" and "commitments."  This is simply too speculative a basis upon which to

9   support a damages award.  Nothing in the record indicates that these persons had given money

10  to Chachoua in the past, that they had the assets to make good on the pledges supposedly made,

11  or even that they had a history of donating money to medical research or charity.  There are no

12  records documenting the alleged "commitments" or their amounts, and no reliable evidence that

13  the organizations would have transferred the money to Chachoua once it had been received.

14         For all these reasons, the court concludes that any damages award based on this testimony

15  would be speculative.  Stated otherwise, the testimony of Pope and Hallgren revealed that the fact

16  of damage is uncertain, as there is no evidence that the "commitments" they described were

17  anything but contingent. See, e.g., *Smith, Inc., v. SHN Consulting Engineers & Geologists, Inc.*,

18  89 Cal.App.4th 638, 651 (2001) ("Our courts have long held that 'it is uncertainty as to the fact

19  of damage, rather than its amount, which negatives the existence of a cause of action,'" quoting

20  *Walker v. Pacific Indemnity Co.*, 183 Cal.App.2d 513, 517 (1960)); *Piscitelli v. Friedenberg*, 87

21  Cal.App.4th 953 (2001) ("Whatever its measure in a given case, it is fundamental that 'damages

22  which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal

23  basis for recovery. . .,'" quoting *Frustuck v. City of Fairfax*, 212 Cal.App.2d 345, 367-68

24  (1963)); *Mozzetti v. City of Brisbane*, 67 Cal.App.3d 565, 577 (1977) ("It is black-letter law that

25  damages which are speculative, remote, imaginary, contingent or merely possible cannot serve

26

27

28         [11]*Id.* at 872:10-12.

as a legal basis for recovery").[12]

Moreover, assuming *arguendo* that an award of lost potential future grant monies did not run afoul of the rule that speculative damages cannot be recovered, partial summary judgment on Chachoua's prayer for this type of damages on the breach of contract claim would be appropriate. As noted earlier, Chachoua specifically represented prior to the commencement of the first trial that he sought to recover lost potential grant monies only in connection with his conspiracy to defame claim, and did *not* seek such damages on his breach of contract claim. Prior to the first trial, Cedars filed a motion *in limine* to exclude, *inter alia*, "evidence of any alleged special damages, or damages for mental suffering, for an alleged breach of Plaintiff's contract with Cedars."[13] In response, Chachoua specifically represented that he did not oppose the exclusion of this type of evidence.[14] Moreover, during argument of the motion, his attorney stated that he intended to offer evidence of lost potential grant monies only in connection with the defamation claim. During his closing argument to the jury, he told it the same thing. Any claim that he was entitled to recover lost potential grant monies on the breach of contract claim was thus waived.

Were any further clarification needed in this regard, Chachoua reiterated his position in opposing Cedars' motion for a new trial:

> "The evidence also shows that the jury's award of approximately $10,000,000.00 represented general damages, not special or consequential damages. Plaintiff's only argument at trial for special damages was in connection with the defamation claim where Dr. Chachoua submitted evidence that he lost grant money as a result

---

[12]Moreover, at least as respects Hallgren's testimony, much of the evidence was stricken pursuant to hearsay and lack of foundation objections by defendant. (See RT 870:25-872:6.) Hallgren purported to testify to statements made by Mats' mother, and offered that testimony to prove the truth of those statements, i.e., that she intended to provide substantial funds for Chachoua's research.

[13]Defendants' Memorandum of Points and Authorities in Support of Motion in Limine at 2:15-17.

[14]See Plaintiff's Opposition to Defendants' Motion in Limine at 2:20.

11

of being defamed, not as a result of the breach of contract. Plaintiff's damages for breach of contract were the loss of the sera, vaccines and prime materials themselves which cost approximately $12,000,000.00 to develop. These are general damages because they flow directly from the breach of the agreement."[15]

Plaintiff does not deny that he made these assertions during the first trial and in connection with post-trial motions, but maintains that "[n]othing precludes [him] from seeking such [a] recovery in a new trial."[16] The court cannot agree. Chachoua's failure to oppose the motion *in limine,* and his express statements to the court and to the jury that he did not seek such damages for Cedars' alleged breach of contract constituted a waiver or abandonment of any such claim he had previously asserted in the action. See, e.g., *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir. 2000) ("The third claim is deemed abandoned because the milk producers have not opposed its dismissal in their briefs and argument to this court"); *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir. 2000) ("Given the lack of discussion of the wage fraud claims in the appellants' briefs or at oral argument, we find that the appellants have abandoned their wage fraud claims"); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (because plaintiff failed to address the

---

[15]Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for New Trial ("Pl.'s New Trial Opp.") at 3:13-24 (citations omitted). In the court's Order Denying Defendant's Motion for Judgment as a Matter of Law and Granting Motion for New Trial ("New Trial Order"), it clearly relied on this representation by Chachoua, stating: "Defendants assert that the jury may improperly have considered evidence of future research grants in arriving at its damages award. Pope and Hallgren testified that their organizations either had or were about to commit millions of dollars to plaintiff's work. Plaintiff's attorney specifically stated in closing argument, however, that these monies were to be considered by the jury only in connection with the defamation claim, and the court instructed the jury that it could not award speculative damages on the contract claim . . . . Moreover, plaintiff concedes, in his opposition to Cedars' motion, that evidence of lost grant monies cannot be used to support the verdict. Consequently, it is appropriate to eliminate evidence of this species of damage in assessing whether the $10,111,250 award on the breach of contract claim was contrary to the clear weight of the evidence." (New Trial Order at 19-20.) This reflects the clarity of Chachoua's waiver and abandonment of any right to recover such damages.

[16]Pl.'s Opp. at 17:6-7.

12

theory of alter ego in its opposition to defendant's motion for summary judgment, and did not raise the theory in its own summary judgment motion, the district court properly treated the theory "as abandoned" and "no longer an issue in [the] case"); *USA Petroleum Company v. Atlantic Richfield Co.*, 16 F.3d 1276, 1284 (9th Cir. 1994) ("It is a general rule that a party cannot revisit theories that it raises but abandons at summary judgment"); *Cavic v. Pioneer Astro Industries*, 825 F.2d 1421, 1425 (10th Cir. 1987) (statute of limitations defense, though raised in the answer, pretrial order, and counsel's opening statement, was never mentioned during the actual trial and could not be pursued on appeal); *Northern Natural Gas Co. v. Hegler*, 818 F.2d 730, 734 (10th Cir. 1987) (argument that could be inferred from a trial exhibit, but was not otherwise discussed, could not be argued on appeal); *Dumbell Ranch Co. v. Cherokee Exploration, Inc.*, 692 F.2d 706, 707-08 (10th Cir. 1982) (implied license claim, though mentioned in some pre-trial memoranda and by one witness, did not appear in the answer or the pre-trial order, and was not discussed by counsel at trial, and thus was waived); *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978) ("It is immaterial whether the issue was not tried in the district court because it was not raised or because it was raised but conceded by the party seeking to revive it on appeal").

In opposition to Cedars' motion for summary judgment, Chachoua now contends that the evidence at trial– i.e., the testimony of Michael Pope and Bo Hallgren – and his own unsigned declaration create a triable issue of fact as to whether he may recover special damages on the contract claim in the form of lost potential grant monies.[17] Chachoua clearly abandoned any such claim at earlier stages of the litigation. That abandonment and waiver preclude him from now seeking to recover lost grant monies on the breach of contract claim. See *Doe v. Lawrence Livermore Nat'l. Laboratory*, 1999 WL 169532, *5 (N.D. Cal. March 22, 1999) ("Here, plaintiff expressly stated that he was not asserting a procedural due process claim, and did so to convince this Court to certify for interlocutory appeal its order dismissing some of plaintiff's claims. Therefore, plaintiff has waived his right to raise his procedural due process claim now"). On this alternative basis as well, defendant's motion for partial summary judgment as respects lost grant

---

[17]See Pl.'s Opp. at 15.

13

1money damages is granted.

### 5.   Cost Or Value Of Plaintiff's "Prime Materials" Or "Sera"

Defendant next seeks partial summary judgment on Chachoua's right to recover as contract damages the cost of developing the prime materials or products.[18]   It asserts that Chachoua cannot recover such damages as a matter of law because: (1) he did not expressly inform Cedars of the value of the prime materials or products; (2) Cedars had no reason to know that the products were valuable;   (3) the damages are entirely speculative; and (4) there is no cognizable proof supporting Chachoua's claim that development of the products and prime materials cost $12 million.[19]

Cedars' first two points concern the foreseeability that Chachoua would incur such damages if a contract breach occurred. See CAL. CIV. CODE § 3300; See also *Applied Equipment Corp.*, *supra*, 7 Cal.4th at 515 ("Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time"); *North Am. Chem. Co. v. Superior Court*, 59 Cal.App.4th 764, 784 (1997) ("However, it is not at all clear that the damages allowable for a breach of contract would necessarily include the very substantial damages which North American alleges it had to pay to NHT. Depending on the resolution of such issues as the parties' knowledge and reasonable expectations at the time of the North America/Harbor Pac contract and the then-foreseeable harm which could reasonably flow from breach (i.e., the standard for measuring contract damages under Civil Code section 3300), such damages might well be limited to the contract price or the market value of the damaged boric acid . . . ."); *Resort Video*, *supra*, 35 Cal.App.4th at 1697 ("It is often said that damages must be 'foreseeable' to be recoverable for breach of contract").

As respects foreseeability, Chachoua has submitted a declaration stating that he specifically told Cedars the value of the products.  He states:

"In January 1996, I had a meeting at Cedars with two of its physicians, Dr. Shlomo

---

[18]See Def.'s Mem. at 9-13.

[19]See *id.*

14

Melmed and Dr. Eric Daar.  Dr. Daar informed me that he was a director of the Cedars Infectious Disease Center.  I explained to Dr. Melmed and Dr. Daar about the work that I had done, and made a presentation to them at that time.  I told them that I had spent over 15 years and over $12,000,000.00 in developing my products. I told them about the prime materials that I had from which I had developed the sera and cultures, and how they were irreplaceable and had a huge value.  The 'prime materials' are original materials from which the sera is developed."[20]

While plaintiff admits that he never testified to this fact during the first trial, he asserts this is because he was never asked directly whether he made such a statement.  As with his assertion that he told Cedars he had $100 million in grant funds available, this portion of the declaration does not directly contradict Chachoua's trial testimony.  For the reasons stated above, and based on the authority cited above, therefore, it is properly considered in deciding Cedars' motion for partial summary adjudication.  So considered, it raises a genuine issue of material fact as to whether Cedars knew or had reason to know the value of the prime materials and products at the time it contracted with plaintiff.[21]

The more fundamental problem with the evidence is that it does not constitute cognizable proof of the cost of developing the prime materials and products.  Chachoua asserts in conclusory fashion that he spent $12 million developing the products and prime materials.  Such a conclusory

---

[20]Chachoua Decl., ¶ 4.  Cedars objects to this paragraph on the ground that it violates Rule 56(e) in that it does not recite specific facts regarding "what Plaintiff . . . told Cedars 'about' the prime materials, and what he specifically told Cedars about 'how' they were supposedly irreplaceable and had a huge value."  (Def.'s Evid. Objs., ¶ A.)  The declaration is sufficiently specific, however, as it states that Chachoua told Melmed and Daar how much it had cost to develop the products and prime materials.  His reference to the fact that the prime materials were "irreplaceable" and had a "huge value" must be read in this context.  Consequently, the court concludes that Rule 56(e) is satisfied, and the objection is overruled.

[21]The declaration, of course, is unsigned, and thus is not technically admissible under Rule 56(c).  For the reasons stated *supra*, note 6, however, the court has considered its substance.

assertion, unsupported by evidentiary facts, is insufficient to defeat summary judgment.[22]  See

*Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e) ] is not

to replace conclusory allegations of the complaint or answer with conclusory allegations of an

affidavit"); *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) ("As an initial

matter, the affidavits in the Excerpts of Record are unsigned and undated.  Leaving aside whether

the affidavits are legitimate, admissible evidence, they are insufficient to raise a genuine issue of

material fact.  As the district court noted . . ., the affidavits are entirely conclusory.  The

declarations do not present any specific facts to support the appellants' claims of fraud or to

establish that the appellants were entitled to payments that they did not receive.  Thus, the

appellants failed to set forth specific facts or identify with reasonable particularly the evidence that

precluded summary judgment.  The district court therefore did not err in granting the appellees'

motion for summary judgment"); *Broussard v. University of California, at Berkeley*,192 F.3d

1252, 1259 (9th Cir. 1999) ("The Church declaration is the type of conclusory allegation which

this court found insufficient to withstand the motion for summary judgment"); *Delange v. Dutra*

*Constr. Co.*, 183 F.3d 916, 921 (9th Cir. 1999) (stating that where "the nonmoving party relies

only on his own affidavit to oppose summary judgment, [the party] cannot rely on conclusory

allegations unsupported by factual data to create an issue of material fact" (internal quotations and

citations omitted)); *Lindsey v. Shalmy*, 29 F.3d 1382, 1385 (9th Cir. 1994) ("Mere conclusory

assertions of discriminatory intent, embodied in affidavits or deposition testimony, cannot be

sufficient to avert summary judgment"); *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993)

("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it

cannot rely on conclusory allegations unsupported by factual data to create an issue of material

fact")

Chachoua has failed to produce documents, records, or other evidence supporting his

contention that development of the products cost $12 million.  He has even failed to detail how

---

[22]In fact, the statement in his declaration asserts the proposition only indirectly.  Chachoua states he told Melmed and Daar that the products and prime materials cost $12 million to develop. He does not state directly that the development process cost this much.

16

1   such a large sum was spent.  As at trial, he has not identified the components that make up the
2   $12 million figure, or provided any breakdown whatsoever — he has not assigned a cost to the
3   time he expended in the development process, described the fees he paid for testing of the
4   products, or described any other specific cost associated with the work.  Chachoua has produced
5   no records of the expenditures he made, or the grant funds he received during the course of his
6   purported twelve year study.  Nor has he asserted that such records are no longer in existence.
7   Finally, he has proffered no records of the tests he conducted or the data bank he established.[23]
8   Consequently, the court concludes that he has failed to raise a triable issue of fact regarding the
9   damages he suffered as measured by the cost of the products and prime materials that were not
10  returned to him.

11          As respects Chachoua's statement that the products would generate billions of dollars in
12  revenue once they were brought to market, this is an entirely speculative assertion, and cannot
13  form the basis for a damage award as a matter of law.  First, as the court held in the new trial
14  order, Chachoua is not qualified to render an opinion as to the amount of revenue his products
15  would generate if offered for sale in the market, as he has no demonstrated expertise in the
16  marketing of pharmaceutical or drug products, and testified at trial that his opinion was based on
17  information he had gathered talking to other people and reading various materials.[24]  Second, the
18  products are new and have never been marketed.  They have not, as yet, received FDA approval.
19  They are, in short, in the early stages of any process that would lead ultimately to their marketing
20  and sale.  As with any new product or business, estimates of lost profits are speculative, and will
21  not support a damages award.  See, e.g., *Shade Foods, Inc. v. Innovative Products Sales &*
22  *Marketing, Inc.*, 78 Cal.App.4th 847 (2000) ("It has been frequently stated that if a business is

23  _____

24          [23]At trial, Chachoua asserted that he had photographs and/or X-rays that reflected his
     development work, and that he allegedly showed to Melmed and Daar at the initial meeting.
25   While the documents were excluded because they had not been identified as exhibits and produced
     in accordance with the Local Rules and Federal Rules of Civil Procedure, the court notes that he
26   has made no effort to submit them in opposition to this motion.  There is no indication, moreover,
27   that even these documents contain any cost information.

28          [24]See New Trial Order at 27.

new, it is improper to award damages for loss of profits because absence of income and expense experience renders anticipated profits too speculative to meet the legal standard of reasonable certainty. . .," quoting *Gerwin v. Southeastern. Cal. Assn. of Seventh Day Adventists,* 14 Cal.App.3d 209, 221 (1971)); *Resort Video, supra,* 37 Cal.App.4th at 1698 (same). The exception to this is when the evidence shows with reasonable certainty both the occurrence and the extent thereof. See *Resort Video, supra; Gerwin, supra,* 14 Cal.App.3d at 221. Here, neither the extent nor the occurrence of the billions of dollars in revenue predicted by Chachoua has been shown with reasonable certainty. Consequently, his statement that he would have earned billions of dollars marketing the products is speculative and will not support a damages award. Moreover, even were the damages recited by Chachoua not speculative, his single conclusory statement regarding the market value of the products would be insufficient to raise a triable issue of fact for the reasons cited above.

In short, because the only evidence in the record concerning the value of Chachoua's products, and the cost to develop them, are self-serving, conclusory statements by the plaintiff himself, the court sustains Cedars' objection to this portion of Chachoua's declaration under Rule 56(e) of the Federal Rules of Civil Procedure,[25] and concludes that partial summary judgment on this aspect of Chachoua's damages claim is properly granted in Cedars' favor.

### B.     Plaintiff's Motion To Reopen Discovery

On August 3, 2001, Chachoua filed a motion seeking leave to reopen discovery and designate expert witnesses.[26] Specifically, Chachoua represents that he wishes to depose Cedars' employees who worked in the laboratory and may have knowledge of the parties' contract. He further indicates that he wishes to designate an expert witness on the issue of damages.[27] On

---

[25]See Def.'s Evid. Objs., ¶ A.

[26]See Plaintiff's Memorandum of Points and Authorities in Support of Motion for Leave to Reopen Discovery ("Pl.'s Mem.") at 3.

[27]See Plaintiff's Memorandum of Points and Authorities in Support of Motion for Leave to Reopen Discovery ("Pl.'s Mem.") at 4-5.

1  August 10, 2001, he filed a Supplement to the motion, asserting that discovery should be

2  reopened because his former attorney, Jean Marie Hansen, allegedly has twenty-seven boxes of

3  documents in her possession that he should be allowed to discover prior to retrial.[28]  Cedars

4  counters that the court should deny the motion because plaintiff has failed to demonstrate good

5  cause for a reopening of discovery.[29]

6         **1.**    **Rule 16**

7         Rule 16 of the Federal Rules of Civil Procedure authorizes the court to enter a pretrial

8  scheduling order, and to include therein a deadline for discovery.  See FED.R.CIV.PROC. 16.

9  Pursuant to this rule, once a district court issues a pretrial scheduling order, it  "shall not be

10  modified except upon a showing of good cause and by leave of the district judge . . . ."  *Id.*  See

11  also *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) ("Generally, Federal

12  Rule of Civil Procedure 15(a) liberally allows for amendments to pleadings.  In this case,

13  however, the district court correctly found that it should address the issue under Federal Rule of

14  Civil Procedure 16 because it had filed a pretrial scheduling order that established a timetable for

15  amending the pleadings, and the deadline had expired before Jeney, Gentile, and Coleman moved

16  to amend"); *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998) ("If we considered

17  only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and

18  effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil

19  Procedure").

20         The "good cause" standard primarily considers the diligence of the party seeking to amend

21  the scheduling order.  See *Coleman, supra*, 232 F.3d at 1294.  Thus, the court should grant

22  Chachoua's motion for leave to reopen discovery only if the original deadline set by the court

---

24  [28]See Plaintiff's Supplement to Motion to Reopen Discovery ("Pl.'s Supp. Mem.") at 2.

26  [29]See Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion to Reopen Discovery ("Def.'s Opp."). In its opposition, Cedars requested a continuance of the hearing on plaintiff's motion to reopen discovery in the event the court denied its motion for partial summary judgment. (See *id.* at 1-2.) Because defendant's motion has been granted, the court denies the request for a continuance as moot.

1    could not "reasonably [have] be[en] met despite [the] diligence of the party seeking the

2    extension." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1990).

3           Here, the court issued a scheduling order on April 19, 1999, which established October

4    15, 1999 as the fact discovery cut-off, and November 15, 1999 as the expert witness discovery

5    cut-off. Because Chachoua sought leave to reopen discovery almost two years after the October

6    1999 cut-off date, his motion effectively seeks modification of the court's scheduling order.

7    Plaintiff must therefore show that good cause justifies the reopening of discovery at this stage of

8    the proceedings. See FED.R.CIV.PROC. 16(b); *Coleman*, *supra*, 232 F.3d at 1294; *Johnson*,

9    *supra*, 975 F.2d at 609.

10                    **2.    Chachoua Has Failed To Demonstrate Good Cause**

11          Chachoua maintains there is good cause to modify the scheduling order and reopen

12   discovery because his current attorney, who substituted into the case after the discovery cut-off,

13   did not receive all relevant documents from his former counsel, Hansen.[30] Chachoua represents

14   that he is involved in litigation with Hansen, and that discovery in that case ended June 30, 2001.

15   According to Chachoua, he filed a motion to compel Hansen's production of documents, which

16   the judge granted. Nonetheless, he states, Hansen does not have to make the documents available

17   for inspection until some time in October. Because trial in this case is scheduled to begin October

18   9, 2001, plaintiff asserts he will be unable to discover the documents so that they may be used at

19   trial.[31]

20          As noted earlier, however, it is plaintiff's conduct that is the focus of the court's inquiry

21   under Rule 16(b). The relevant question is whether the moving party has diligently attempted to

22   comply with the deadlines established in the scheduling order. See *Johnson*, *supra*, 975 F.2d at

23   609 ("Although the existence or degree of prejudice to the party opposing the modification might

24   supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's

25

26          [30]See Plaintiff's Reply to Opposition to Motion for Leave to Reopen Discovery ("Pl.'s

27   Reply") at 2-3.

28          [31]See Pl.'s Supp. Mem. at 2.

1  reasons for seeking modification. *If that party was not diligent, the inquiry should end*" (internal

2  citations omitted) (emphasis added)).

3      Plaintiff's current counsel – Kaplan, Kenegos & Kadin – substituted into this lawsuit on

4  January 18, 2000, more than a year and a half ago.  Thus, the attempt to retrieve documents from

5  Hansen clearly could have been initiated  at an earlier date.  This is particularly true since the

6  court issued its ruling granting a new trial on November 21, 2000 – some nine months ago.  In

7  any event, the judge in Chachoua's litigation with Hansen has already granted plaintiff's motion

8  to compel, and there is thus no reason for this court to "reopen discovery."  If the timing of the

9  production of documents poses a problem for Chachoua in this case, he can seek relief from the

10  judge who issued the production order.[32]

11      Plaintiff also requests that discovery be reopened so that he may depose employees in

12  Cedars' laboratory who may have information regarding the parties' contract.   Here too,

13  Chachoua fails to establish that he has acted diligently.  Chachoua filed this case on July 28, 1997.

14  He has had more than four years to depose the and other individuals with relevant knowledge, but

15  has failed to do so.  While Chachoua suggests that any failure to conduct discovery is the fault

16  of his various lawyers – some four or five in all – he is responsible for any lack of diligence on

17  the part of his counsel.  See *Pioneer Investment Servs. Co. v. Brunswick Assos. L.P.*, 507 U.S.

18  380, 396 (1993) ("we have held that clients must be held accountable for the acts and omissions

19  of their attorneys"); *Link v. Wabash R. Co.*, 370 U.S. 626, 633-34(1962) ("Petitioner voluntarily

20  chose this attorney as his representative in the action, and he cannot now avoid the consequences

21  of the acts or omissions of this freely selected agent.   Any other notion would be wholly

22  inconsistent with our system of representative litigation, in which each party is deemed bound by

23  the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be

24

25

_____

26     [32]An ex parte application to continue the hearing on defendant's motion for partial

27  summary judgment – filed by a lawyer who is not Chachoua's counsel of record along with a
substitution of attorney – suggests, in fact, that he has already begun to be afforded access to some

28  of the Hansen documents.

21

charged upon the attorney" (quotations omitted)).[33] Under these circumstances, it cannot be said that Chachoua has acted diligently. See *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1058 (7th Cir. 2000) ("The district court took the view that Ms. Kalis' attempt to secure discovery from Colgate was belated. Indeed, Ms. Kalis did not raise the issue until after the close of discovery, after a motion for summary judgment had been filed, after a briefing schedule had been set, and after her time for response had come and gone. We do not believe that the district court abused its discretion in considering the summary judgment motion, without first compelling discovery, when Ms. Kalis had been so lax in asserting her rights"); *Modern Continental/Obayashi v. Occupational Safety & Health Review Comm'n*, 196 F.3d 274, 281 (1st Cir. 1999) ("[Plaintiff's] lack of diligence both in pursuing its own discovery requests and in responding to the Secretary's provides more than adequate grounds for the judge's refusal to grant [plaintiff's] untimely motion to compel"); *Shahar v. Bowers*, 120 F.3d 211, 213 (11th Cir. 1997) ("Given that Ms. Shahar, in the district court, made no motions to compel the discovery of the names of law department employees who had engaged in adultery, we cannot say that the information about Mr. Bowers which she seeks to inject into the case now – almost six years after she filed her lawsuit and more than three years after the district court ruled against her – was information which she could not have discovered with due diligence years ago"); *Biggs v. Wilson*, Nos. 92-15334, 92-15936, 1993 WL 306237, *4 (9th Cir. Aug. 12, 1993) (Unpub. Disp.) ("Here, the record supports the district court's conclusion that Biggs failed to show good cause to amend the Pretrial Scheduling Order. First, Biggs did not file his Rule 16(b) motion until two months after both the established discovery completion date and the filing of the court's order on the cross- motions for summary judgment. Second, and more important, Biggs filed his Rule 16(b) motion four months after he became aware of Wilson's summary judgment motion on the issue of liquidated damages. . . . Biggs offers no satisfactory explanation for his failure to file a Rule 16(b) motion in the two months prior to the September 30, 1991, completion date. We conclude Biggs was not diligent

---

[33]The court notes as well that Chachoua has, on three or more occasions during the pendency of the litigation, represented himself *pro se*. During these periods of time, little, if any, discovery was requested or completed.

in seeking the extension of the discovery completion date found in the Pretrial Scheduling Order, and therefore the district court did not abuse its discretion by denying Biggs's dilatory Rule 16(b) motion"); *Irwin v. State of Wisconsin*, No. 92-2509, 1993 WL 134051, *24, n. 3 (7th Cir. Apr. 28, 1993) (Unpub. Disp.) ("If plaintiffs knew in November 1991 that the logs existed, knew that defendants had not produced them, and failed to file a motion to compel production, they are hard pressed now to assert that they were diligent in their attempts to produce the evidence during the pendency of the motion for summary judgment"); *Cybiotronics, Ltd. v. Golden Source Electronics, Ltd.*, No. 99CV10522, 2001 WL 327826, *7 (C.D. Cal. Feb. 26, 2001) ("Plaintiff has insufficiently explained why it has failed to take the Golden Source deposition in the over seven months that have elapsed since it was first noticed on July 6, 2000. Other than a vague reference to Golden Source's 'refusal' to make a witness available for deposition, Plaintiff offers no explanation for why it has presented no evidence of active pursuit of the deposition, why it has apparently filed no motion to compel the deposition, or why there is no other evidence of its diligent pursuit of this allegedly crucial discovery. Nor has Plaintiff explained (a) why it waited until July 6, 2000 to seek the deposition in the first place (nine months after the Complaint was filed) or (b) what has happened in the intervening seven month period between July, 2000 and the present. . . . While presenting no evidence of its own 'diligence,' Plaintiff may not also seek this Court's indulgence, and further delay summary judgment. Under these circumstances, Plaintiff's lack of diligence is on its own a sufficient basis to deny its Rule 56(f) motion"); *Wsol v. Fiduciary Mgmt. Assocs., Inc.*, No. 99 C 1719, 2000 WL 748143, *3 (N.D. Ill. June 1, 2000) ("During a hearing in October 1999 on [defendant's] motion to compel responses to discovery requests served four months earlier, the court noted [defendant's] lack of diligence in enforcing its discovery rights").

As respects Chachoua's request to reopen discovery so that he may designate an expert witness on the issue of damages, the court notes that its decision to grant defendant's motion for partial summary judgment moots this issue. Even were this not the case, however, the court would decline to reopen discovery given the findings it made in its February 8, 2000 order granting Cedars' motion to exclude plaintiff's expert witnesses for failure to comply with Rule

1  26 of the Federal Rules of Civil Procedure.[34] Chachoua did not act diligently with respect to the

2  designation of expert witnesses and cannot demonstrate good cause at this juncture for relief from

3  his default.

4        In short, Chachoua has failed to demonstrate good cause justifying modification of the

5  scheduling order at this late date.  See *Johnson*, *supra*, 975 F.2d at 609.  See also *Coleman*,

6  *supra*, 232 F.3d at 1295; *Biggs*, *supra*, 1993 WL 306237 at *4.  The district court has wide

7  discretion to supervise the pretrial aspects of litigation.  See *Miller v. Safeco Title Ins. Co.*, 758

8  F.2d 364, 369 (9th Cir. 1985) ("The district court is given broad discretion in supervising the

9  pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order . . .

10 will not be disturbed unless they evidence a clear abuse of discretion").  See also *Packnett  v.*

11 *Gomez*, No. 98-16371, 1999 WL 376106, *1 (9th Cir.  May 18, 1999) (Unpub. Disp.) ("The

12 district court is given broad discretion in supervising pretrial litigation which will not be disturbed

13 unless it is a clear abuse of discretion"); *Bilbud Rancho Cal. Ltd. v. Johnson & Johnson Dev.*

14 *Corp.*, No. 94-55709, 1996 WL 266445, *5 (9th Cir. May 17, 1996) (Unpub. Disp.) ("The

15 district court had the power under Rule 16 to control its docket by providing a cutoff date for

16 pleadings amendments. . . .  [I]t would be a great surprise to most lawyers and judges to discover

17 that we construe Rule 15(a) so broadly as to strip the district court of its powers under Rule

18 16(b). . ."); *Vranesh v. Foley*, No. 89-15975, 1990 WL 102774, *5 (9th Cir. July 23, 1990)

19 (Unpub. Disp.) ("Fed.R.Civ.P. 16(b) provides the district court with broad powers to control the

20 scheduling of proceedings before it"); *Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir.

21 1990) ("Rule 16(b) of the Federal Rules of Civil Procedure authorizes the district court to control

22 and expedite pretrial discovery through a scheduling order.  Consistent with the authority vested

23 in the trial court by rule 16, our court gives the trial court 'broad discretion to preserve the

24 integrity and purpose of the pretrial order,'" quoting *Hodges v. United States*, 597 F.2d 1014,

25 1018 (5th Cir. 1979)).  The court has equally broad discretion to determine whether new evidence

26

27        [34]Under Rule 26, the parties must disclose the identify of their expert witnesses
   "accompanied by a written report prepared and signed by the witness," at least ninety days before
28 the trial date.  FED.R.CIV.P. 26(b)(2)(B)-(C). ·

1  will be allowed on retrial. See *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United*

2  *States of America Co.*, 195 F.3d 765, 775-76 (5th Cir. 1999) ("We review refusals to reopen

3  discovery for abuse of discretion. . . . Based on Diamond & Gem's post-remand proffering of

4  additional evidence without any explanation of why it did not offer it at the first trial, and based

5  on the injustice that might result for Martin's in having to prepare for this new evidence, the court

6  did not abuse its discretion in limiting Diamond & Gem to the witnesses and evidence it offered

7  at the first trial"); *Habecker v. Clark Equipment Co.*, 36 F.3d 278, 288 (3d Cir. 1994) ("We have

8  consistently recognized that the assertion of new issues on retrial is typically within the sound

9  discretion of the district court. As presider over the trial, the district court is in the best position

10  to control all aspects of trial, including further motions, discovery and court time. We cannot say

11  that the district court did not exercise sound discretion in denying Habecker's motion"); *Piper*

12  *Aircraft*, *supra*, 985 F.2d at 1449 (same); *Total Containment*, *supra*, 2001 WL 818535, at *4

13  ("District courts have the discretion to admit or exclude new evidence on retrial"). Consequently,

14  the court denies the motion to reopen discovery at this late stage of the proceedings.

15

16  ## II. CONCLUSION

17    For the foregoing reasons, the court grants defendant's motion for partial summary

18  judgment on the issue of damages and denies plaintiff's motion to reopen discovery.

19

20  DATED: August 27, 2001

21             MARGARET M. MORROW

           UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28